952 F.2d 538
 293 U.S.App.D.C. 182, 129 P.U.R.4th 632,
22 Envtl. L. Rep. 20,546
 UNITED STATES DEPARTMENT OF the INTERIOR, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
City of New Martinsville, West Virginia, City of Jackson,
Ohio, City of Pittsburgh and the Pittsburgh Water
and Sewer Authority, the Upper Ohio
River Basin Hydro Association,
Intervenors.
STATE OF WEST VIRGINIA, DEPARTMENT OF NATURAL RESOURCES, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
City of New Martinsville, West Virginia, City of Jackson,
Ohio, the Upper Ohio River Basin Hydro
Association, Intervenors.
AMERICAN RIVERS, Friends of the Earth, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
The City of Jackson, Ohio, City of Pittsburgh and the
Pittsburgh Water and Sewer Authority, City of New
Martinsville, West Virginia, the Upper
Ohio River Basin Hydro
Association, Intervenors.
COMMONWEALTH OF PENNSYLVANIA, Pennsylvania Fish Commission,
Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Upper Ohio River Basin Hydro Association, City of Pittsburgh
and the Pittsburgh Water and Sewer Authority, City
of Jackson, Ohio, City of New
Martinsville, West Virginia,
Intervenors.
 Nos. 90-1405, 90-1406, 90-1408 and 90-1409.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 21, 1991.
Decided Jan. 10, 1992.
 
 [293 U.S.App.D.C. 183] On Petitions for Review of Orders of the Federal Energy Regulatory Commission (No. 2971).
 Blake A. Watson, Atty., Dept. of Justice, with whom Barry M. Hartman, Acting Asst. Atty. Gen., and David C. Shilton, Atty., Dept. of Justice, Washington, D.C. and Michael L. Harvey, Deputy Atty. Gen., Com. of Pa., Harrisburg, Pa., were on the brief for petitioners, U.S. Dept. of the Interior and Pennsylvania Fish Com'n in 90-1405 and 90-1409.
 Maria M. Fakadej, Charleston, W.Va., for petitioner, State of W.Va. in 90-1406.
 Ronald J. Wilson, Washington, D.C., was on the brief for petitioners, American Rivers and Friends of the Earth in 90-1408.
 Samuel Soopper, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, Jerome M. Feit, Sol., and Joseph S. Davies, Deputy Sol., Washington, D.C., were on the brief, for respondent in 90-1405, 90-1406, 90-1408 and 90-1409.
 Donald H. Clarke and Barbara S. Jost, Washington, D.C. for the Upper Ohio River Basin Hydro Ass'n, George W. Jacoby, Pittsburgh, Pa. for the City of Pittsburgh and the Pittsburgh Water and Sewer Authority, Peter C. Kissel and Alan I. Robbins, Washington, D.C. for the City of Jackson, Ohio and Louis Rosenman, Washington,, [293 U.S.App.D.C. 184] D.C. for the City of New Martinsville were on the joint brief, for intervenors in all cases.
 Mary K. Conturo and Ashley C. Schannauer, Pittsburgh, Pa., entered appearances for intervenors, the City of Pittsburgh and the Pittsburgh Water and Sewer Authority in 90-1408 and 90-1409.
 Jonathan W. Gottlieb, Washington, D.C., was on the brief for amici curiae in all cases urging that the Court affirm the Orders of the Com'n.
 Before EDWARDS, RUTH BADER GINSBURG and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 This case presents another skirmish in the continuing battle between utilities and municipalities seeking to produce electricity and agencies and individuals seeking to protect the environment. Here, the Federal Energy Regulatory Commission ("FERC" or "Commission") licensed sixteen projects in the Upper Ohio River Basin over objections from the United States Department of Interior ("Interior") and several state agencies and interest groups. In the case at hand, the petitioners now claim that FERC (i) granted the disputed licenses without sufficient data to assess the environmental impacts of the projects, and (ii) gave insufficient weight to environmental concerns raised by the projects. In addition, the State of West Virginia raises separate claims that FERC unjustifiably preempted its rights under the Clean Water Act and inadequately provided for recreational uses. On the record before us, we find that FERC adhered to all relevant statutory requirements, acted on substantial evidence and reasonably confronted uncertain conditions. We further find that the claims raised by West Virginia have been adequately addressed by FERC, with necessary assurances given to allay the concerns of State officials. We therefore deny the petitions for review in all respects.
 
 FACTS
 
 2
 Beginning in 1979, Allegheny Electric Cooperative and others filed applications to operate hydroelectric power projects at 19 existing dams in the Upper Ohio River Basin. A total of 25 applications were filed, five of which were mutually exclusive. In early 1987, FERC determined that, because the projects presented a danger of reducing the rivers' water quality, the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) (1988), required the preparation of an Environmental Impact Statement ("EIS").
 
 
 3
 In May 1988, FERC staff published a draft EIS. The Commission solicited comments from interested parties, including the petitioners in this case, and FERC staff held a public meeting in Pittsburgh, Pennsylvania. The petitioners submitted written comments which focused on three concerns: the effect of the projects on dissolved oxygen ("DO") levels in the river, the level of fish mortality resulting from entrainment (passage of fish through turbines), and the disruption of public sport fishing. The dissolved oxygen level of water determines the capacity of the river to support marine life and absorb waste. The dams in the Ohio River Basin increase the DO level by aerating water as it passes over the dam. Hydropower projects tend to reduce aeration because water passes over turbines instead of falling freely over the crest of the dam. Fish mortality from entrainment obviously lowers fish populations, but also tends disproportionately to affect desirable sport fish species which live near dams. Sport fishing is an important recreational use of the existing properties, and could be disrupted by project development.
 
 
 4
 On September 29, 1988, FERC issued its final EIS ("FEIS"). The FEIS analyzed the proposed projects from a number of different perspectives, including power generation, impact on water quality and fishery resources, effects on recreational facilities, and socioeconomic conditions. In responding to the concerns expressed by Interior and the state environmental agencies, the FEIS offered five alternatives ranging from denial of all license applications [293 U.S.App.D.C. 185] to granting each license as proposed. FERC, after receiving comments on the FEIS from Interior and the state agencies,established a deadline for these parties to provide recommendations pursuant to section 10(j) of the Federal Power Act ("FPA"), 16 U.S.C. § 803(j) (1988), which requires FERC to consider environmental issues and recommendations.
 
 
 5
 The "agencies" responded, suggesting that no recommendations could be given until seven more environmental impact studies were completed, including further modeling and testing of DO levels and fish entrainment.[1] West Virginia also requested that FERC require licensees to admit the public to grounds adjacent to the project powerhouses, the most desirable sites for sport fishing. After twice meeting with the commenting agencies and attempting to reach an agreement on the proposed projects, FERC rejected the requests for further studies, concluding that the FEIS provided enough information to proceed. The Commission then adopted the licensing alternative recommended in the FEIS. In response to West Virginia's request, FERC agreed to allow fishing at the desired sites, except where safety or other obstructions prevented it.
 
 
 6
 In deciding which projects to license, FERC opted for a moderately protective construction scheme. In addition to the option of denying all license applications, the FEIS had analyzed four alternatives wherein differing numbers of the projects would be built or operated at different power levels. The Commission opted to license 16 of the proposed 19 sites, concluding that the alternative selected, "[i]n addition to protecting water quality, ... would protect target resources by avoiding the significant adverse impacts to wetlands, fisheries, and recreation that would occur if the proposed projects at [the three unlicensed sites] were built." Allegheny Elec. Coop., 48 F.E.R.C. p 61,363, at 62,343 (1989). "The FEIS considered the adverse impacts of these [unlicensed] projects to be unavoidable, because no adequate site-specific mitigative measures were found to currently exist." Id. n. 231. Balancing the power benefits against potential environmental harms, the Commission concluded that the alternative best advanced competing goals. Id. at 62,361-70.
 
 
 7
 The Commission addressed the DO level concern by adopting a 6.5 mg/l minimum for all projects where current levels met or exceeded that mark. Id. at 62,364. The FEIS had considered four options for different DO standards: no conditions, conditioning operation on 5.0 mg/l DO, conditioning operation on 6.5 mg/l DO, and conditioning operation on maintenance of pre-project DO levels. FEIS at 2-1 to 2-27, reprinted in Joint Appendix ("J.A.") 43-69. The Commission rejected a 5.0 mg/l DO standard, the current standard set by the three bordering states, as too low to ensure continued fish development. A study by the United States Environmental Protection Agency had established 6.5 mg/l as the level necessary to maintain unimpeded fish development. "[T]he most up-to-date information regarding the relationship of DO levels to fishery and other aquatic resources is contained in EPA's 1986 water quality criteria document. This document clearly indicates that, so long as DO levels are maintained at 6.5 mg/L or above, no life stage of fishery resources will be adversely affected." 48 F.E.R.C. at 62,364; see also FEIS at 4-13, J.A. 173 (admitting inconsistencies in EPA document, but utilizing it as the best available study). Given the recent cleanup of the Upper Ohio Basin and the resurgence of desirable species of game fish, the Commission sought to maintain conditions for their development. 48 F.E.R.C. at 62,364.
 
 
 8
 The 6.5 mg/l requirement included 11 of the 16 licenses granted, where the present dams were considered fair or good aerators. To meet the DO standard, the FEIS had specified minimum spill flows at each project. FEIS at 4-94 to 4-95, J.A. 254-55. FERC adopted these flow levels. The [293 U.S.App.D.C. 186] Commission estimated that the 6.5 mg/l standard would cause "an annual fuel displacement loss of 246,000 barrels of oil" and would
 
 
 9
 result in a loss of approximately $11 million in annual revenues for local governments when compared to [the least restrictive alternative]. However, on balance, we do not believe that these lost displacement benefits and lost local government revenues outweigh the potential adverse impacts to the resurgent fishery resources in the basin that could occur if the proposed projects were allowed to reduce DO levels below 6.5 mg/L.
 
 
 10
 48 F.E.R.C. at 62,364.
 
 
 11
 FERC also took several other steps to protect water quality. First, the Commission included license conditions "requiring the licensees with projects located at the 11 dams that are moderate to good aerators to cease generation or take other appropriate steps, should DO levels at their projects fall below 6.5 mg/L even with the required spill flows." Id. at 62,366. Second, the Commission retained authority to modify the other five projects to improve water quality if necessary. Id. at 62,367. Third, FERC required all licensees to join a water quality management group ("WQMG"), which included members of the federal and state agencies, and "to submit for Commission approval any recommendations for modifications in the spill flows or other conditions at the project" coming from the WQMG. Id. Fourth, the Commission included in each license a reservation of authority, enabling it on its own motion or the motion of the federal and state agencies to "order reasonable modifications in project structures or operations to conserve or develop fish and wildlife resources." Id. at 62,367.[2] Finally, although rejecting the state agencies' requests to require DO to remain at pre-project levels,[3] the Commission acknowledged that the states were empowered by section 401(a)(1) of the Clean Water Act to impose the more stringent requirement if they so desired. Id. at 62,366-67.
 
 
 12
 As to fish entrainment, the FEIS evaluated data from several other projects, including two on the Ohio River. FEIS at 4-26, J.A. 186. The Commission concluded that minimal mortality would occur to fish eggs and larvae entrained.
 
 
 13
 [A]s discussed in the FEIS, considerable evidence from steam electric power industry studies and other studies indicates that passing fish eggs and larvae through pumps and condensers does not cause high levels of damage to fish eggs and larvae, and ... the relevant engineering parameters of condenser-cooling pumps, such as shear, hits, cavitation, and atmospheric pressure change, are similar to but more severe than those of the bulb turbines that would be used in the proposed project.
 
 
 14
 48 F.E.R.C. at 62,376 (footnote omitted); see also FEIS at 4-31, J.A. 191. While acknowledging that "existing studies have not provided definitive answers to questions regarding the magnitude of entrainment" that would occur on the proposed projects, 48 F.E.R.C. at 62,378, the Commission concluded that, "on the basis of the existing credible scientific evidence and ... their best professional judgment," juvenile and adult mortality would be between zero and 10 percent of fish entrained. Id. In balancing, the Commission assumed the worst case, 10 percent mortality rate, and concluded that licensing the 16 projects [293 U.S.App.D.C. 187] was in the public interest, even at that mortality level. Id.
 
 
 15
 Despite its conclusion that the projects should be constructed even at the 10 percent mortality rate, the Commission imposed other conditions to reduce the number of fish killed, including:
 
 
 16
 (1) monitoring of actual entrainment once project operations have begun; (2) compensation to the state resource agency for project-related losses unless and until site-specific mitigation is installed; (3) a basin-wide cooperative effort to develop prototype facilities for fish protection and guidance (bioengineering test facility); and (4) reevaluation of mitigation options, based on the results of such testing.
 
 
 17
 Id. at 62,377. To effect the fourth condition, FERC included reservations of authority that permit it to impose new conditions to protect fishery resources on its own motion or on the motion of Interior or the state agencies. Id. at 62,382.
 
 
 18
 Finally, to protect sport fishing opportunities in the tailwaters below dams, FERC required project licensees to provide access to powerhouse tailwaters, consistent with safety requirements, wherever physically possible. Id. at 62,384. Licensees were charged with acquiring additional land where necessary to guarantee public access. Where on-site access was physically obstructed, FERC required licensees to provide off-site recreational facilities. Id.
 
 
 19
 Petitioners sought rehearing, asserting the same arguments which had divided the parties since the issuance of the FEIS. FERC denied rehearing in all respects, 51 F.E.R.C. p 61,268 (1990). These petitions for review followed.
 
 ANALYSIS
 
 20
 We will address petitioners' contentions in turn. First, we conclude that FERC acted upon substantial evidence in determining its approach to dissolved oxygen and mortality from entrainment. The Commission's approach adequately balanced the power and non-power interests. Second, we hold that FERC's actions in the face of uncertainty, including utilizing license conditions requiring continued study and evaluation, were lawful and reasonable. Finally, we find that FERC did not preempt West Virginia's rights to impose water quality standards, and that the Commission made adequate provision for preserving recreational uses.
 
 A. Standard of Review
 
 21
 Our review of the Commission's decision is deferential. See Cajun Elec. Power Coop. v. FERC, 924 F.2d 1132, 1135 (D.C.Cir.1991); Pacific Gas & Elec. Co. v. FERC, 720 F.2d 78, 84 (D.C.Cir.1983). In a licensing decision such as this, where few explicit statutory provisions govern, our role is narrowly circumscribed.
 
 
 22
 We defer to the agency's expertise, particularly where the statute prescribes few specific standards for the agency to follow, so long as its decision is supported by "substantial evidence" in the record and reached by "reasoned decisionmaking," including an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and the choice made.
 
 
 23
 Electricity Consumers Resource Council v. FERC, 747 F.2d 1511, 1513 (D.C.Cir.1984). "[T]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 16 U.S.C. § 825l(b) (1988); see also Cities of Anaheim, Riverside, Banning, Colton & Azusa v. FERC, 941 F.2d 1234, 1245-46 (D.C.Cir.1991).
 
 B. FERC's Decision To License
 
 24
 Under the FPA, FERC may license hydroelectric projects on federal lands and on waterways that are subject to congressional regulation under the Commerce Clause. 16 U.S.C. § 797(e) (1988). Under sections 4(e) and 10(a) of the FPA, 16 U.S.C. §§ 797(e), 803(a), as amended by the Electric Consumers Protection Act ("ECPA"), Pub.L. No. 99-495, 100 Stat. 1243 (1986), FERC must consider environmental issues when deciding whether to issue hydropower licenses.[293 U.S.App.D.C. 188] In deciding whether to issue any license under [the FPA] for any project, the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality.
 
 
 25
 16 U.S.C. § 797(e) (1988).
 
 
 26
 All licenses issued under this subchapter shall be on the following conditions: That the project adopted ... will be best adapted to a comprehensive plan ... for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat)....
 
 
 27
 16 U.S.C. § 803(a) (1988).
 
 
 28
 Additionally, under section 10(j) of the FPA, 16 U.S.C. § 803(j), FERC must impose conditions on licenses "based on recommendations received pursuant to the Fish and Wildlife Coordination Act (16 U.S.C. § 661 et seq.) from the National Marine Fisheries Service, the United States Fish and Wildlife Service, and State fish and wildlife agencies." § 803(j)(1). FERC retains ultimate authority, however, to decide whether any recommended conditions are "inconsistent with the purposes of" the FPA or other laws. § 803(j)(2). When it acts contrary to a recommendation received from a wildlife agency, FERC must make an appropriate finding on the record to justify its decision. Id.
 
 
 29
 Interior and the state agencies contend that FERC violated the statute and acted without substantial evidence in rejecting their requests for further studies. We conclude that FERC acted within its statutory mandate and supported its decision with substantial evidence. The Commission held, and the petitioners do not contend otherwise, that the requests for additional studies were not themselves section 10(j) recommendations. Therefore, whatever heightened burden FERC may bear in rejecting a recommendation from a wildlife agency was not triggered here.
 
 
 30
 The agencies accordingly contend, first, that FERC violated the statute and its own regulations in refusing to conduct studies that the agencies thought vital to the section 10(j) recommendation process, and, second, that the FERC licensing decisions here violate the mandate of sections 4(e) and 10(a) that environmental concerns be given "equal consideration."[4] The agencies' first objection may be disposed of easily. Nothing in the statute requires FERC to conduct the studies that the fish and wildlife agencies deem necessary to the section 10(j) process. Section 10(j)(1) requires the Commission to consider recommendations "received pursuant to the Fish and Wildlife Coordination Act (16 U.S.C. § 661, et seq )." 16 U.S.C. § 803(j)(1). Under the Coordination Act, agency recommendations are made "based on surveys and investigations conducted by the United States Fish and Wildlife Service and such state agenc[ies]." 16 U.S.C. § 662(b) (1988) (emphasis added). The agencies' alternate contention--that FERC's own regulation, 18 C.F.R. § 4.38(b)(2) (1990), nevertheless required the Commission to conduct the studies--was not presented on rehearing [293 U.S.App.D.C. 189] below. Therefore, it is waived. Town of Norwood v. FERC, 906 F.2d 772, 774 (D.C.Cir.1990).[5]
 
 
 31
 We also reject the agencies' contentions founded on sections 4(e) and 10(a). The statutory "equal consideration" requirement does not change the standard of review that we, as an appeals court, apply. The ECPA amendments to the FPA, which added the "equal consideration" language to section 4(e) and created the section 10(j) process, were aimed primarily at increasing FERC's sensitivity to environmental concerns. See H.R. REP. No. 507, 99th Cong., 2d Sess. 21-22 (1986) ("It is intended that the Commission give significant attention to, and demonstrate a high level of concern for all environmental aspects of hydropower development...."); H.R. CONF.REP. No. 934, 99th Cong., 2d Sess. 21 (1986) ("The amendments expressly identify fish and wildlife protection, mitigation, and enhancement, recreational opportunities, and energy conservation as nondevelopmental values that must be adequately considered by FERC when it decides whether and under what condition to issue a hydroelectric license for a project.").
 
 
 32
 Furthermore, the ECPA amendments do not give environmental factors preemptive force. First, FERC still is charged with determining the "public interest," i.e., balancing power and non-power values. Even where the fish and wildlife agencies make formal section 10(j) recommendations, those agencies have no veto power. See National Wildlife Fed'n v. FERC, 912 F.2d 1471, 1480 (D.C.Cir.1990) ("While the Commission must address each recommendation, the discretion ultimately vests in the Commission as to how to incorporate each recommendation. If we read the statute any other way, the Commission would be held hostage to every agency recommendation, and the Commission's role of reconciling all competing interests would be compromised.").
 
 
 33
 Second, the Conference Report makes clear that the substantial evidence review of section 825l is not abrogated simply because FERC decides an "environmental" fact instead of a power fact.
 
 
 34
 To address concerns that the input from [the fish and wildlife] agencies could be ignored, watered down, or undervalued, the Commission may only reject, in part or whole, a recommendation of any of these agencies concerning any specific project after attempting to resolve the difference with the agencies and after publishing a finding (and reasons therefor) that such recommendation is inconsistent with the purposes and requirements of the Federal Power Act and that the conditions selected by FERC meet the statutory standard in section 10(j)(1). Such findings would be subject to judicial challenge with the standard for review being the statutory language and the arbitrary and capricious standard.
 
 
 35
 H.R. CONF.REP. No. 934, at 23 (emphasis added); see also National Wildlife Fed'n, 912 F.2d at 1481 (applying substantial evidence test to FERC rejection of a section 10(j) recommendation).
 
 
 36
 For us, then, the question is whether FERC's licensing decision here is supported by substantial evidence and is not arbitrary and capricious. We think the decision easily passes muster. FERC staff recognized the dissolved oxygen concern early, addressing it in the draft and final environmental impact statements. The Commission recognized that existing studies were inconclusive, but reasonably concluded that the 1986 EPA report established a DO standard that would protect fishery resources. The EPA report constitutes substantial evidence in support of FERC's action, especially since there is no weighty evidence to refute it with respect to the critical points here in issue. In rejecting the anti-degradation standard offered by the agencies, FERC relied upon the report and concluded that the anti-degradation [293 U.S.App.D.C. 190] standard sought to preserve the river for future users, and was not necessary to maintain present environmental resources.
 
 
 37
 FERC staff also confronted the fish entrainment issue early and consistently. The FEIS examined several studies and concluded that mortality would not exceed 10 percent and that, even at that worst-case level, the projects licensed were in the public interest. The 10 percent figure was based on substantial evidence: FERC pointed to studies conducted at several sites and noted that higher mortality levels in some experiments were not controlling because the turbines to be used in the licensed projects were substantially different.
 
 C. FERC's Actions Under Uncertainty
 
 38
 Petitioners nonetheless contend that because FERC recognized that the data it had gathered were inconclusive, the Commission violated its duty under Confederated Tribes and Bands of the Yakima Indian Nation v. FERC, 746 F.2d 466 (9th Cir.1984) ("Yakima "), cert. denied, 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985), fully to consider environmental issues before licensing. In Yakima, FERC issued a hydropower license without studying the impact on anadromous fish resources. Instead, FERC conditioned the license on results to be reached in other proceedings already underway in which fishery issues in the project area would be studied. The Ninth Circuit reversed, holding that "FERC must consider fishery issues before, not after, issuance of a license.... [T]he statute requires that public interest concerns be evaluated as a condition to licensing." Id. at 471.
 
 
 39
 Here, the Commission admitted that additional DO data might increase the certainty of the flow model used to determine the minimum flows necessary to maintain the 6.5 mg/l level. 48 F.E.R.C. at 62,371. Additionally, FERC noted that the evidence on mortality from entrainment was "incomplete and inconclusive for answering impact questions on the Upper Ohio River system quantitatively." Id. at 62,330. Because of these deficiencies, FERC imposed the conditions detailed above, including extensive monitoring and the opportunity to modify the licenses.
 
 
 40
 On the record before us, we hold that FERC's disposition of this case presents no infirmity warranting reversal or reconsideration. Furthermore, contrary to petitioners' assertions, we do not read Yakima to require FERC to have perfect information before it takes any action. Indeed, such a requirement would be contrary to the statutory standard that requires us to affirm any FERC factual finding supported by substantial evidence. 16 U.S.C. § 825l(b). More practically, a perfect information standard would hamstring the agency. Virtually every decision must be made under some uncertainty; the question is whether the Commission's response, given uncertainty, is supported by substantial evidence and not arbitrary and capricious.
 
 
 41
 Yakima at most imposes on the Commission the duty to consider and study the environmental issue before granting a license. Yakima does not require any heightened degree of certainty for environmental facts, nor does it imply that all environmental concerns must be definitively resolved before a license is issued. Read this way, Yakima simply endorses the unstartling principles that an agency must establish a record to support its decisions and that a reviewing court, without substituting its own judgment, must be certain that the agency has considered all factors required by the statute. The Ninth Circuit itself gave Yakima this interpretation in LaFlamme v. FERC. When LaFlamme first came to the court, 852 F.2d 389 (9th Cir.1988), the court reversed FERC's decision to grant a license, finding that FERC had failed to meet section 10(a)'s mandate to consider a "comprehensive plan" of development. "To fulfill its obligation of exploring all issues relevant to the public interest, this type of comprehensive analysis must be performed on the record." Id. at 403 (citing Yakima ). When the case returned to the court after remand, 945 F.2d 1124 (9th Cir.1991), the petitioner alleged that FERC violated Yakima by acting without perfect knowledge. [293 U.S.App.D.C. 191] The court demurred, holding that post-licensing consideration of issues was acceptable because, unlike in Yakima, FERC had issued the "license with full consideration of the environmental issues" and "performed the necessary pre-licensing studies." Id. at 1130.[6]
 
 
 42
 Here, FERC acted reasonably in the face of uncertainty. As detailed above, FERC's conclusions from the otherwise incomplete data were supported by substantial evidence. After weighing its findings regarding the environmental issues versus the potential benefits, the Commission concluded that licensing the sites would be in the public interest. FERC specifically considered the additional studies proposed and found that they were unlikely to provide additional, useful information. 48 F.E.R.C. at 62,372-78.
 
 
 43
 Most importantly, FERC liberally used license conditions to protect against unknown risks. Despite a finding on minimum flows necessary to maintain DO levels at the eleven dams rated fair-to-good aerators, FERC not only conditioned the licenses on flow maintenance but also conditioned them on maintaining the 6.5 mg/l level--thereby eliminating any uncertainty due to the flow prediction model. The Commission also required licensees to participate in study projects designed to discover better approaches to maintaining DO levels and reducing fish mortality from entrainment. FERC additionally required that licensees build their projects to accommodate the future addition of fish protective devices, such as screens over intake pipes, should the bioengineering test facility find them to be beneficial. Finally, FERC included a general reservation of authority permitting it to impose "reasonable modifications ... to conserve and develop fish and wildlife resources." 48 F.E.R.C. at 62,367.
 
 
 44
 These conditions and the "reopener" clause are not merely references to otherwise restrictive modification procedures. See, e.g., FPA § 6, 16 U.S.C. § 799 (1988). When conditions are inserted into the license by FERC, they become integral, substantive parts of the license. As contemplated by the plain language of the license clause, any party, including petitioners here, may petition FERC to enforce the license conditions or exercise its retained authority under the reopener clause. The Commission's action, or lack thereof, would then be subject to judicial review.
 
 
 45
 We previously have recognized the Commission's power to impose broad conditions in the license. In Pacific Gas & Elec. v. FERC, 720 F.2d 78 (D.C.Cir.1983), the developer of a new hydropower plant sought FERC approval to flood out, and therefore render unusable, a smaller, older plant on the same river. The owner of the smaller plant refused to consent and FERC held, based on section 6, that it could not force the owner to accept compensation. The court noted that Congress enacted section 6 to provide licensees with certainty, thereby enabling them to attract private investors to finance development of the nation's waterways. Id. at 83-84. The court also identified the tension between section 6 and section 10(a)'s mandate that the Commission impose conditions on licenses that best protect the public interest. The court thought these policies harmonized by vesting the Commission with wide discretion to set conditions in the license when issued. Identifying a case where the Commission [293 U.S.App.D.C. 192] had taken similar action, the court wrote that if FERC had reserved authority in the older license to issue subsequent licenses utilizing the same resources, section 6 would not be violated. Id. at 84 ("FERC has discretion under section 6 to restrict license terms to any period not exceeding fifty years, and is also authorized by that section to impose additional license conditions at its discretion."). FERC clearly acted within its authority in imposing strict conditions and requiring reopener clauses in the instant case.
 
 
 46
 In sum, we think FERC acted on the basis of substantial evidence in determining the appropriate DO level and in assessing fish mortality from entrainment. Furthermore, we endorse the Commission's actions to address the unknown impacts post-licensing, including resort to extensive license conditions and reopener clauses.
 
 D. West Virginia's Claims
 
 47
 West Virginia, while acceding to the Commission's determination to address DO and entrainment post-licensing, contends that FERC exceeded its authority by imposing water quality conditions in derogation of West Virginia's statutory rights and acted arbitrarily in failing to require maintenance of existing recreational uses. We find that the Commission did not usurp West Virginia's authority and adequately provided for continued sport fishing where feasible.
 
 
 48
 Section 401(a) of the Clean Water Act, 33 U.S.C. § 1341(a) (1988), requires an applicant for a FERC hydropower license to obtain a state water quality certification before FERC may approve the license. FERC may not alter or reject conditions imposed by the states through section 401 certificates. See Keating v. FERC, 927 F.2d 616, 622-23 (D.C.Cir.1991). In fact, FERC here responded in part to the state agencies' contention that the DO standard was too low by noting that the states were free to impose more rigorous conditions in their certificates. 48 F.E.R.C. at 62,366-67.
 
 
 49
 West Virginia contends that some of FERC's license specifications are inconsistent with conditions imposed by the state under section 401. The Commission responded in its rehearing order that nothing in the licenses is intended to contradict the state's requirements.
 
 
 50
 [S]ection 401(d) of the CWA provides that any valid certification issued under section 401 "shall become a condition on any Federal license" for the activity in question. Therefore, the license need not expressly adopt the terms and conditions of such certification; they become terms and conditions of the license as a matter of law. The [initial] order could not contravene this fact, nor did it purport to.
 
 
 51
 51 F.E.R.C. at 61,843 (footnote omitted). FERC repeated this position in its brief and argument to this court; we have no reason to doubt that any valid conditions imposed by West Virginia in its section 401 certificates must and will be respected by the Commission.
 
 
 52
 West Virginia also claims that FERC did not require the licensees to provide adequate facilities to maintain present sport fishing. The tailwaters of the dams presently attract the most desirable gamefish. West Virginia contends that the projects do not provide adequate public access to those tailwaters, which now will be below the powerhouses. At oral argument, however, West Virginia conceded that safety concerns prevented access to the powerhouse itself. Instead, West Virginia argued that the boundaries of the projects should be extended to permit fishing in the tailwater below the powerhouse.
 
 
 53
 FERC has already mandated this action, where physically possible. In its initial order, FERC stated that off-site recreational facilities would be permitted only "where on-site recreational development would be impossible due to physical space limitations cause by bluffs, railroad tracks, or other obstructions." 48 F.E.R.C. at 62,384. The order clearly contemplates that licensees "would be responsible for ensuring that project boundaries, which can include private land acquired by the licensees, are sufficient to provide for such development." Id; see also 51 F.E.R.C. at 61,848 [293 U.S.App.D.C. 193] (same position on rehearing). If the licensees have failed to secure extended boundaries as required by their licenses, petitioners may seek redress from FERC.
 
 CONCLUSION
 
 54
 FERC acted within its statutory authority and pursuant to substantial evidence in granting the licenses at issue in this case. The contested actions of the Commission were neither unlawful nor otherwise arbitrary or capricious. We therefore deny the petitions for review in all respects.
 
 
 
 [1]
 The dissolved oxygen and fish entrainment issues were argued to the Commission by petitioners United States Department of the Interior, the Commonwealth of Pennsylvania, American Rivers, and Friends of the Earth. At times, we refer to these petitioners collectively as the "agencies."
 
 
 [2]
 The Licensee shall, for the conservation and development of fish and wildlife resources, construct, maintain, and operate, or arrange for the construction, maintenance, and operation of such reasonable facilities, and comply with such reasonable modifications of the project structures and operation, as may be ordered by the Commission upon its own motion or upon the recommendation of the Secretary of the Interior or the fish and wildlife agency or agencies of any State in which the project or a part thereof is located, after notice and opportunity for hearing
 Id. n. 331 (quoting Standard Article 15 of Form L-6 (Terms and Conditions of License for Unconstructed Major Project Affecting Navigable Waters and Lands of the United States), 54 F.P.C. 1842, 1847 (1975)).
 
 
 [3]
 The Commission thought that requiring pre-project levels would unfairly force the licensees to subsidize subsequent developments on the river which might tend to degrade the DO level. Id. at 62,365-66
 
 
 [4]
 We have some doubts about the standing of the United States Department of the Interior to advance this second contention. Sections 4(e) and 10(a) do not create rights in the Secretary of the Interior, nor does the Secretary represent individuals potentially injured by FERC's alleged disregard of environmental factors. Even if section 10(j) vests some rights in the Secretary, that does not necessarily give the Secretary standing to protest FERC's balancing under sections 4(e) and 10(a). In this regard, this case is unlike Udall v. FPC, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967), where the Court could point to a specific statutory mandate given the Secretary that Federal Power Commission (FERC's predecessor) action impaired. See 387 U.S. at 439-40, 87 S.Ct. at 1718. Nonetheless, because the state agencies have parens patriae standing, see Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 600-07, 102 S.Ct. 3260, 3265-69, 73 L.Ed.2d 995 (1982), and American Rivers and Friends of the Earth have organizational standing, see Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972), and these parties make identical substantive challenges, we need not resolve the issue regarding Interior's standing
 
 
 [5]
 We note, however, that FERC has issued new regulations which both construe this regulation not to require it to undertake studies requested by the fish and wildlife agencies and implement a new system increasing the ability of these agencies to request any such studies. Regulations Governing Submittal of Proposed Hydropower License Conditions, 56 Fed.Reg. 23,109, 23,119 (May 20, 1991)
 
 
 [6]
 See also Udall v. FPC, 387 U.S. 428, 450, 87 S.Ct. 1712, 1724, 18 L.Ed.2d 869 (1967) (remanding to FERC for consideration of unexplored environmental issues: "The test is whether the project will be in the public interest. And that determination can be made only after an exploration of all issues relevant to the 'public interest,' including future power demand and supply, alternate sources of power, the public interest in preserving reaches of wild rivers and wilderness areas, the preservation of anadromous fish for commercial and recreational purposes, and the protection of wildlife.") (emphasis added); Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC, 876 F.2d 109, 119 (D.C.Cir.1989) ("While the Commission is certainly free to decide, based on substantial evidence, that new license conditions are not called for, we conclude that the Commission's failure to undertake any form of assessment of environmental issues ... was ... an abuse of discretion."); National Wildlife Fed'n v. FERC, 801 F.2d 1505, 1512 & n. 16 (9th Cir.1986) (FERC must create a record regarding statutorily prescribed issues--citing Yakima )