United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 No. 01-1435 September Term, 2002 

 Filed On: January 31, 2003

 

 21st Century Telesis Joint Venture and 
 21st Century Bidding Corporation, 
 Appellants

 v.

 Federal Communications Commission, 
 Appellee

 Salmon PCS, LLC, 
 Intervenor

 Appeal of Orders of the 
 Federal Communications Commission

 -----------

 Before: Randolph and Rogers, Circuit Judges, and 
Williams, Senior Circuit Judge.

 O R D E R

 It is ORDERED, sua sponte, that the opinion filed herein 
on January 31, 2003 is amended by adding a new sentence on 
page 10, line 5, after the word "Act" as follows:

 "21st Century points to FCC v. NextWave Pers. Communi-
cations Inc., 2003 WL 166615 (U.S.), as supporting its claim 

that the automatic cancellation of its licenses was effectively a 
revocation requiring a hearing under s 312, but we do not 
reach the merits of 21st Century's argument because its 
hearing contentions are time-barred."

 Per Curiam

 FOR THE COURT:

 Mark J. Langer, Clerk

 BY:

 Deputy Clerk

 


































 United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 5, 2002 Decided January 31, 2003 

 No. 01-1435

 21st Century Telesis Joint Venture and 
 21st Century Bidding Corporation, 
 Appellants

 v.

 Federal Communications Commission, 
 Appellee

 Salmon PCS, LLC, 
 Intervenor

 Appeal of Orders of the 
 Federal Communications Commission

 Russell D. Lukas argued the cause for appellants. With 
him on the briefs was George L. Lyon, Jr. Thomas Gutierrez 
entered an appearance.

 Stanley R. Scheiner, Counsel, Federal Communications 
Commission, argued the cause for appellee. With him on the 
brief were John A. Rogovin, Deputy General Counsel, and 
Daniel M. Armstrong, Associate General Counsel.

 Before: Randolph and Rogers, Circuit Judges, and 
Williams, Senior Circuit Judge.

 Opinion for the Court filed by Circuit Judge Rogers.

 Opinion concurring in part and dissenting in part filed by 
Senior Circuit Judge Williams.

 Rogers, Circuit Judge: The Federal Communications Com-
mission canceled nineteen broadband licenses held by 21st 
Century Telesis Joint Venture and 21st Century Bidding 
Corporation (collectively "21st Century") following 21st Cen-
tury's failure to make timely installment payments on its 
licenses. 21st Century petitions for review of Commission 
orders determining that 21st Century was provided adequate 
notice before cancellation of its licenses, and declining to 
consider 21st Century's late filed arguments that the auto-
matic cancellation rule exceeds the Commission's statutory 
authority and as applied violates due process. In re Request 
for Extension of Installment Payment Due Date, 15 F.C.C.R. 
14,814 (2000) ("Division Order"), reconsideration denied, In 
re Licenses of 21st Century, 15 F.C.C.R. 25,113 (2000) ("Re-
consideration Order"), further reconsideration denied, In re 
Licenses of 21st Century, 16 F.C.C.R. 17,257 (2001) ("Second 
Reconsideration Order"). We dismiss the petition in part 
and we deny the petition in part. Because 21st Century's 
challenges to the automatic cancellation of its C block licenses 
are either moot or unripe, 21st Century lacks standing to 
bring those challenges, and we dismiss that part of the 
petition. Because 21st Century fails to show with respect to 
its F block licenses either that the Commission abused its 
discretion under 47 U.S.C. s 405 and 47 C.F.R. s 1.106(f) by 
declining to consider late filed hearing arguments, thus mak-
ing it improper for the court to address those contentions, or 
that the Commission failed to provide sufficient notice of 21st 
Century's payment obligations, we deny the petition in part.

 I.

 The Communications Act of 1934 ("Act"), as amended in 
1993, authorizes the Commission to award radio licenses 
"through a system of competitive bidding." 47 U.S.C. 
s 309(j)(1). In designing such a system, Congress directed 
the Commission to "promot[e] economic opportunity ... by 
disseminating licenses among a wide variety of applicants, 
including small businesses." Id. s 309(j)(3)(B). Consistent 
with this goal, Congress further directed the Commission to 
"consider alternative payment schedules and methods of cal-
culation, including lump sums or guaranteed installment pay-
ments." Id. s 309(j)(4)(A). Pursuant to this mandate, the 
Commission reserved two blocks of licenses, the "C" and "F" 
blocks, for bidding by small businesses, as defined in terms of 
annual gross revenues and total assets. In re Implementa-
tion of Section 309(j) of the Communications Act, 9 F.C.C.R. 
5532 p p 12, 115 (1994). Noting that the "primary impediment 
to participation" in license auctions by small businesses is 
"lack of access to capital," id. at p p 10, 135, the Commission 
adopted an installment payment plan to allow successful 
bidders in the C and F blocks to "pay their winning bid over 
time." Id. at p p 16, 136-38. In announcing these measures, 
the Commission stated that "[t]imely payment of all install-
ments will be a condition of the license grant and failure to 
make such timely payment will be grounds for revocation of 
the license." Id. at p 138.

 In May 1996 and January 1997, 21st Century was a suc-
cessful bidder, ultimately obtaining thirteen C block licenses 
and six F block licenses. Each license stated on its face that 
it was "conditioned upon the full and timely payment of all 
monies due [under the Commission's installment plan]" and 
that "[f]ailure to comply with this condition will result in 
automatic cancellation of this authorization." Under the 
Commission's installment plan C block licensees were re-
quired to pay 90% of their net bid price over ten years, with 
interest only paid for the first six years and interest and 
principal paid for the remaining four, 47 C.F.R. s 24.711(b)(3) 
(1996), and F block licensees were required to pay 80% of 
their net bid price over ten years, with interest only paid for 

the first two years and interest and principal paid for the 
remaining eight. 47 C.F.R. s 24.716(b)(3) (1996).

 After receiving numerous requests for relief from finan-
cially troubled licensees, the Commission, on March 31, 1997, 
suspended installment payment obligations for C block licen-
sees, and on April 28, 1997, extended the suspension to F 
block licensees. In re Amendment of the Comm'n's Rules 
Regarding Installment Payment Financing for PCS Licen-
sees, Second Report and Order and Further Notice of Pro-
posed Rule Making, 12 F.C.C.R. 16,436 p p 6, 14 (1997) 
("Restructuring Order"). The suspensions ended on Sep-
tember 25, 1997, when the Commission adopted three new 
payment methods "designed to assist C block licensees expe-
riencing financial difficulties." Id. at p p 1, 31-69. The 
Commission gave licensees until June 8, 1998 to choose one 
of the three restructuring schemes, and until July 31, 1998 
to resume installment payments. Public Notice, Wireless 
Telecommunications Bureau Announces June 8, 1998 Elec-
tion Date for Broadband PCS C Block Licensees, 13 
F.C.C.R. 7413 (1998). Among the restructuring options, 21st 
Century chose disaggregation, which required it to return 
half of its 30 MHz of spectrum to the Commission in return 
for forgiveness of the outstanding debt associated with the 
returned 15 MHz, Restructuring Order, 12 F.C.C.R. 16,436 
p p 39-40, and the Commission sent 21st Century a Note 
Modification dated July 15, 1998, setting the dates for fu-
ture installment payments as "October 31, January 31, April 
30, and July 31 of each year."

 Several months before licensees were to resume payment, 
the Commission adopted rules regarding untimely payments. 
47 C.F.R. s 1.2110(f) (1999). Under the new regulations, 
licensees have an automatic 90-day "non-delinquency" period 
after the installment payment due date, during which time 
payment can be made with a five percent late fee. Id. at 
s 1.2110(f)(4)(I). If the licensee fails to remit the missed 
installment during this first grace period, the rule provides 
for a second automatic 90-day period in which the licensee 
can remit payment with an additional late fee of ten percent. 
Id. at s 1.2110(f)(4)(ii). Failure to submit an installment by 

the last day of the second 90-day period results in automatic 
cancellation of the license without further action by the 
Commission. Id. at s 1.2110(f)(4)(iii).

 21st Century made timely installment payments through 
April 30, 1999. On July 20, 1999, 21st Century received a 
payment notice from the Commission reminding it of the July 
31, 1999 payment deadline. 21st Century missed this dead-
line, and in accordance with 47 C.F.R. s 1.2110(f)(4)(I), re-
ceived a ninety-day extension. On October 19, 1999, 21st 
Century received a notice from the Commission reminding it 
to make its October 31 payment and its July 31 payment with 
the requisite late fee. 21st Century again failed to make its 
July 31 payment, and in accordance with 47 C.F.R. 
s 1.2110(f)(4)(ii), received a second ninety-day extension, 
making the final deadline for payment January 27, 2000. 
When 21st Century did not submit its July 31, 1999 payment 
by January 27, 2000, its licenses were automatically cancelled.

 Thereafter, beginning on February 2, 2000, 21st Century 
sought an extension of the payment deadline or a waiver of 
the automatic cancellation rule. In the first of three letters, 
James LaBelle, 21st Century's Chief Executive Officer, ex-
plained that 21st Century was "unable to ensure that wire 
transfers would be received [by the Commission by] January 
27, 2000," but that as of February 2, 2000, such funds were 
available to be sent upon assurance from the Commission that 
the licenses had not been canceled; the letter also stated that 
some of the payment notices from the Commission had not 
been received or had been received late. See Letter from 
James A. LaBelle to Magalie Roman Salas (Feb. 2, 2000). 
The second letter did not mention the payment notices, but 
reiterated that 21st Century had the funds to cover the 
payment if the Commission could assure it that its licenses 
had not been canceled. See Letter from James A. LaBelle to 
Magalie Roman Salas (Apr. 25, 2000). The third letter 
stated both that the Commission had not met its responsibili-
ty of sending payment notices to 21st Century, and that 21st 
Century had sufficient funds to make payment. See Letter 
from James A. LaBelle to Magalie Roman Salas (July 25, 
2000). On August 7, 2000, the Commission's Auction and 

Industry Analysis Division ("Division") denied 21st Century's 
request for an extension of the January 27, 2000 late payment 
deadline and its request for waiver of the Commission's 
automatic cancellation rule, stating that "21st Century was 
aware of the deadline for submission of the installment pay-
ment and had ample time to secure financing." Division 
Order, 15 F.C.C.R. 14,814 (referred to by 21st Century as 
"Division Letter Ruling"). The Division referenced notice of 
the applicable deadlines from the Commission's rules, the face 
of the licenses, and the installment payment plan notes 21st 
Century executed. Id.

 Pursuant to 47 C.F.R. s 1.106(f), providing thirty days 
from the denial of its requests to submit a "petition for 
reconsideration and any supplement," 21st Century timely 
filed, on September 6, 2000, a petition for reconsideration of 
the Division Order, arguing that 21st Century had not re-
ceived clear notice from the Commission with respect to its 
payments and that the Division did not give the waiver 
request a "hard look." After the thirty-day period had 
expired, 21st Century filed, on November 9, 2000, a motion 
for leave to file a supplement to its petition for reconsidera-
tion and a Supplement to the Petition, which argued that the 
Commission's automatic cancellation rule violates due process 
and that 21st Century had a statutory right to a pre-
cancellation hearing. The Commission denied 21st Century's 
petition for reconsideration on December 21, 2000, finding 
that 21st Century had ample notice of the payment deadline 
and that a waiver would not be in the public interest; the 
Commission declined to address 21st Century's hearing argu-
ments because they had not been timely filed. Reconsidera-
tion Order, 15 F.C.C.R. 25,113 n.4. The Commission also 
denied 21st Century's second petition for reconsideration on 
the grounds that 21st Century's requests for an extension of 
time or waiver were filed after the payment deadline, that 
21st Century had failed to raise any new facts as required for 
reconsideration, and that the Commission was not required 
under 47 C.F.R. s 1.106(f) to accept the untimely filed due 
process claim because 21st Century provided no explanation 

for its absence from the initial petition. Second Reconsidera-
tion Order, 16 F.C.C.R. 17,257 p p 11-24.

 II.

 Before turning to the merits of 21st Century's challenges to 
the Commission orders, the court must address two threshold 
issues. The Commission contends, first, that 21st Century 
has neither Article III standing to contest the cancellation of 
its C block licenses nor prudential standing to raise its due 
process and hearing contentions before the court. Second, 
even if 21st Century has standing, the Commission contends 
that 21st Century's due process and hearing contentions are 
time barred and thus unreviewable. Unlike our dissenting 
colleague, neither we nor the parties find an exception in 
Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 
(1998), to the requirement that the court must initially deter-
mine whether a party has standing to bring each of its 
contentions before the court. In Steel Co. the Supreme Court 
rejected "the doctrine of hypothetical jurisdiction," id. at 94, 
and in distinguishing cases of "extraordinary procedural pos-
tures," id. at 98, the Court does not suggest that the excep-
tion identified by the dissent applies where party A is chal-
lenging agency actions on several grounds, as distinct from 
circumstances where resolution of the appeal of party B in 
separate litigation has the effect of resolving a merits ques-
tion raised by party A "with the consequence that the juris-
dictional question could have no effect on the outcome." Id. 
at 98.

 A.

 The "irreducible constitutional minimum" for Article III 
standing is that the petitioner was injured in fact, that its 
injury was caused by the challenged conduct, and that the 
injury would likely be redressed by a favorable decision of the 
court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 
(1992); Microwave Acquisition Corp. v. FCC, 145 F.3d 1410, 
1412 (D.C. Cir. 1998). The Commission contends that 21st 
Century lacks Article III standing with regard to its C block 

licenses because it no longer seeks reinstatement of those 
licenses and, therefore, has no redressable injury. 21st Cen-
tury responds that it has Article III standing both because it 
had standing on the day it filed its notice of appeal, and 
because it remains subject to FCC "debt collection proce-
dures," as well as higher bidding requirements in future 
auctions, which could be redressed by a decision in its favor. 
We conclude that the court does not have jurisdiction to 
review 21st Century's challenge to the cancellation of its C 
block licenses.

 Article III, section 2 of the Constitution limits federal 
courts to deciding "actual, ongoing controversies." Honig v. 
Doe, 484 U.S. 305, 317 (1988). Although standing is deter-
mined "at the time [an] action commences," Friends of the 
Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc. 528 U.S. 167, 
191 (2000); Advanced Mgmt. Tech., Inc. v. FAA, 211 F.3d 
633, 636 (D.C. Cir. 2000); U.S. Airwaves, Inc. v. FCC, 232 
F.3d 227, 232 (D.C. Cir. 2000) (citing Smith v. Sperling, 354 
U.S. 91, 93 n.1 (1957)), the court is not relieved from evaluat-
ing mootness "through all stages" of the litigation in order to 
ensure there remains a live controversy. Lewis v. Cont'l 
Bank Corp., 494 U.S. 472, 477 (1990); see also Laidlaw, 528 
U.S. at 189. Thus, "[e]ven where litigation poses a live 
controversy when filed, the doctrine [of mootness] requires a 
federal court to refrain from deciding it if 'events have so 
transpired that the decision will neither presently affect the 
parties' rights nor have a more-than-speculative chance of 
affecting them in the future.' " Clarke v. United States, 915 
F.2d 699, 701 (D.C. Cir. 1990) (citation omitted); see also Am. 
Family Life Assurance Co. v. FCC, 129 F.3d 625, 628 (D.C. 
Cir. 1997).

 When 21st Century filed its appeal to the court, it had 
suffered a financial injury-in-fact from the loss of its C block 
licenses; that injury resulted from the Commission's auto-
matic cancellation of its licenses; and it was seeking rein-
statement of its C block licenses. 21st Century's subsequent 
decision not to seek reinstatement of its C block licenses, 
however, rendered moot its claim of financial injury resulting 
from the loss of those licenses by eliminating any possibility 

that a decision of the court could redress that injury. Fur-
ther, contrary to 21st Century's position, its standing cannot 
be based on the fact that it remains subject to the Commis-
sion's debt collection procedures and higher bidding require-
ments in future auctions. First, regarding debt collection, 
because 21st Century defaulted in making timely payments 
for its licenses, it is required, under 47 C.F.R. ss 1.2104(g)(2), 
1.2109, to pay the difference between the amount of its 
outstanding debt and the reauction price of its licenses, as 
well as a penalty of three percent of the reauction price. See 
also Mountain Solutions, Ltd. v. FCC, 197 F.3d 512, 522-23 
(D.C. Cir. 1999). However, 21st Century would remain sub-
ject to such debt collection even if the court granted its 
petition. By choosing not to seek reinstatement of its C 
block licenses, 21st Century is effectively giving up the licens-
es, which subjects it to the same penalties under 
s 1.2104(g)(2) for defaulting. Second, regarding future bid-
ding, the matter is unripe. While the Commission's rules 
require previous defaulters to pay 1.5 times more on future 
winning auction bids than non-defaulters, see In re Amend-
ment of Part 1 of the Comm'ns Rules, 15 F.C.C.R. 15,293 p 42 
(2000), 21st Century has provided no evidence that it intends 
to participate in future auctions. The Supreme Court has 
instructed that "[a] claim is not ripe for adjudication if it rests 
upon contingent future events that may not occur as antici-
pated, or indeed may not occur at all." Texas v. United 
States, 523 U.S. 296, 300 (1998) (internal quotation marks 
omitted). Without any indication from 21st Century that its 
participation in a Commission auction is "certainly impend-
ing," Wyoming Outdoor Council v. United States Forest 
Serv., 165 F.3d 43, 48 (D.C. Cir. 1999) (citation omitted), its 
challenge to the cancellation of its C block licenses by reason 
of future bidding requirements is unripe for review.

 Accordingly, because "Congress' decision to grant a partic-
ular plaintiff the right to challenge an Act's constitutionality 
... eliminates any prudential standing limitations...." 
Raines v. Byrd, 521 U.S. 811, 820 n.3 (1997), we dismiss the 
petition with regard to the challenges to the C block licenses 
cancellation.

 B.

 The second threshold question is whether the court can 
properly consider 21st Century's contentions that the Com-
mission's automatic cancellation rule violates due process and 
that it was entitled to a pre-cancellation hearing under 
s 312(c) of the Act. 21st Century points to FCC v. NextWave 
Pers. Communications Inc., 2003 WL 166615 (U.S.), as sup-
porting its claim that the automatic cancellation of its licenses 
was effectively a revocation requiring a hearing under s 312, 
but we do not reach the merits of 21st Century's argument 
because its hearing contentions are time-barred. Section 
405(a) of the Act provides that "[a] petition for reconsidera-
tion must be filed within thirty days from the date upon 
which public notice is given of the order." 47 U.S.C. 
s 405(a). Section 1.106(f) of the Commission's rules further 
states that "[n]o supplement or addition to a petition for 
reconsideration ..., filed after expiration of the 30 day 
period, will be considered except upon leave granted upon a 
separate pleading for leave to file, which shall state the 
grounds therefor." 47 C.F.R. s 1.106(f). Although s 405 
does not prohibit the Commission's consideration of late filed 
petitions, and the language of its rule affords discretion to the 
Commission to review late-filed claims, Second Reconsidera-
tion Order, we find no abuse of discretion by the Commission 
in declining to address 21st Century's hearing and due pro-
cess arguments. Consequently, these contentions are not 
properly before the court.

 21st Century filed its hearing arguments on November 9, 
2000, more than thirty days after the Division Order of 
August 7, 2000. It never stated any grounds for its failure to 
meet the filing deadline. Thus, 21st Century failed both to 
meet the filing deadline and to provide an explanation of why 
the arguments in its Supplement to the Petition were not part 
of its initial petition for reconsideration. The Commission 
explained that 21st Century's failure to raise its hearing 
arguments in either its letters or its initial petition "thwarts 
procedures designed to bring a prompt and final resolution to 
matters." 16 F.C.C.R. 17257 p 18.

 The court has discouraged the Commission from accepting 
late petitions in the absence of extremely unusual circum-

stances. Virgin Islands Tel. Corp. v. FCC, 989 F.2d 1231, 
1237 (D.C. Cir. 1993); Reuters Ltd. v. FCC, 781 F.2d 946, 
951-52 (D.C. Cir. 1986); cf. Gardner v. FCC, 530 F.2d 1086, 
1091-92 & n.24 (D.C. Cir. 1976). In Virgin Islands, for 
example, the court found no abuse of discretion when the 
Commission declined to entertain a late-filed petition in the 
absence of extenuating circumstances prohibiting a timely 
filing. 989 F.2d at 1237; cf. Reuters, 781 F.2d at 952. 
Similarly here, the Commission could properly conclude that 
it was "not inclined to exercise [its] discretion to hear late-
filed supplements when [the] petitioner offers no plausible 
explanation as to why supplemental arguments were not 
made in an initial petition." Second Reconsideration Order, 
16 F.C.C.R. 17,257 p 18. 21st Century's position that the 
Commission was required to review its late-filed due process 
claim because it raises a constitutional issue is without merit. 
While 21st Century focuses on the court's statement that 
"agencies do have 'an obligation to address properly present-
ed constitutional claims which ... do not challenge agency 
actions mandated by Congress,' " McBryde v. Comm. to Rev. 
Circuit Council Conduct, 264 F.3d 52, 62 (D.C. Cir. 2001) 
(quoting Graceba Total Communications, Inc. v. FCC, 115 
F.3d 1038, 1042 (D.C. Cir. 1997)), it ignores the fact that 21st 
Century's hearing arguments were not properly presented, 
and hence the Commission was under no obligation to review 
them.

 Nonetheless, 21st Century maintains that the court can 
review its hearing arguments on the merits even though the 
Commission declined to do so. Responding to the Commis-
sion's reliance on Virgin Islands for the proposition that 
"issues must be raised before the Commission as a prerequi-
site to our review," 989 F.2d at 1237 (citation omitted), 21st 
Century relies on Time Warner Entm't Co. v. FCC, 144 F.3d 
75 (D.C. Cir. 1998), in support of its view that its hearing 
arguments were flagged such that "a reasonable Commission 
necessarily would have seen the question ... as part of the 
case presented to it," id. at 81, and thus the court can review 
its hearing contentions. However, the requirement that ar-
guments be "raised before the Commission" is not satisfied 
by an untimely supplement filed without excuse such that the 

Commission could properly deny leave to file. See Virgin 
Islands, 989 F.2d at 1237. 21st Century's reliance on AT&T 
Co. v. FCC, 974 F.2d 1351 (D.C. Cir. 1992), is to no avail as 
nothing in that case indicates that there was a late filing or 
other procedural default. Id. at 1354. 21st Century's hear-
ing arguments were not properly raised before the Commis-
sion because they were untimely filed. By failing to comply 
with the Commission's procedural requirements, 21st Century 
thus failed to exhaust its administrative remedy. As the 
court held in Northwestern Indiana Tel. Co., Inc. v. FCC, 872 
F.2d 465, 470-71 (D.C. Cir. 1989), cert. denied, 493 U.S. 1035 
(1990), a case in which constitutional claims were at issue:

 Petitioners contend, however, that section 405's ex-
 haustion requirement has been met by virtue of the 
 [Commission's] having enjoyed an "opportunity" ... 
 to address these claims. As we just noted, however, 
 exhaustion principles normally require compliance 
 with the agency's procedural rules.... The rele-
 vant inquiry is thus whether, in light of petitioners' 
 initial failure to raise constitutional and statutory 
 issues, the Commission erred in not addressing 
 these arguments.... We think not.
 
Consequently, 21st Century is procedurally barred under 
s 405 of the Act and s 1.106(f) of the Commission's rules 
from presenting its hearing contentions to the court.

 III.

 Turning to the remaining merits contentions in 21st Centu-
ry's petition for review, 21st Century challenges the Commis-
sion's orders on the ground the Commission failed to provide 
it with notice of its payment obligations before canceling its 
licenses, as required by the Commission's rules. The court 
need not decide if the Commission's rules require such notice 
because the record shows that 21st Century had notice of its 
payment obligations before its F block licenses were canceled.

 The Commission notified 21st Century of the terms of its 
installment plan on at least six different occasions: (1) Each 
of the installment plan notes, signed by the President or the 
Secretary of 21st Century, included an amortization table 

setting forth the specific amounts due and the date by which 
the payments were due; (2) The face of each license issued to 
21st Century stated that full and timely payment was re-
quired to avoid license cancellation; (3) The Restructuring 
Order, 12 F.C.C.R. 16,436, described the new payment dead-
lines associated with the restructuring scheme, reiterated the 
importance of full and timely payments, and provided exam-
ples of how to calculate those payments; (4) The Note Modi-
fication sent after 21st Century elected disaggregation set 
forth the actual dates for 21st Century's future installment 
payments; (5) The Commission's payment policy, announced 
by public notice and subsequently codified at 47 C.F.R. 
s 1.2110(f), stated that licensees that miss a payment dead-
line by more than 180 days are in default and face automatic 
license cancellation, see Public Notice, Wireless Telecommu-
nications Bureau Provides Guidance on Grace Period and 
Installment Payment Rules, 13 F.C.C.R. 18,213 (1998); and 
(6) The Commission sent notices, which it characterizes as 
"courtesy payment notices," to remind licensees of their 
impending payment deadlines.

 Notwithstanding these notices of its payment obligations, 
21st Century contends that the payment rules were confusing 
and that it often received incorrect or late payment notices 
from the Commission, thereby making any notice it did 
receive ineffective. James LaBelle, 21st Century's Chief 
Executive Officer, stated in his declaration that 21st Century 
was "never clear as to the amount of [its] installment pay-
ments;" received payment notices late in January 2000; re-
ceived payment notices for licenses the company no longer 
owned; and received notices containing incorrect calculations 
of late fees and accrued interest. Relying on Trinity Broad. 
of Florida, Inc. v. FCC, 211 F.3d 618 (D.C. Cir. 2000), Salzer 
v. FCC, 778 F.2d 869 (D.C. Cir. 1985), Satellite Broad. Co. v. 
FCC, 824 F.2d 1 (D.C. Cir. 1987), and Gardner, 530 F.2d 
1086, 21st Century maintains that the court should excuse its 
failure to comply with uncertain rules. However, the cases 
on which 21st Century relies do not support its position.

 In Trinity, the court held that a newly announced rule 
could not be applied against Trinity because the rule was not 
"ascertainably certain," and Trinity did not have fair notice of 

the new requirement. 211 F.3d at 628. The regulation in 
Trinity required companies to establish "minority control" 
over their stations, and Trinity had done so by making 
minorities a majority of its governing board. Id. Unlike 
Trinity, 21st Century never attempted to comply with the 
Commission's rule by making its July 2000 payment in a 
timely manner, and the approximate amounts and require-
ments for making the payments were clear at the time 21st 
Century defaulted, as is evidenced by 21st Century's success-
ful compliance with the payment rule for more than a year. 
Moreover, 21st Century never claimed in its three post-
default-and-license-cancellation letters that its failure to pay 
timely was related to its inability to understand what it owed. 
Rather, 21st Century's letters stated that it had not met the 
payment deadline because it was unable to arrange for timely 
financing due to its general financial problems.

 21st Century's reliance on Salzer and Satellite Broadcast-
ing is also misplaced. In those cases the failure to follow an 
unclear rule was excused in light of an attempt to comply and 
a genuine question of interpretation. In Salzer, the Commis-
sion had not provided the supplemental form required for a 
filing and thus it was reasonable for Salzer to file an other-
wise complete application, only filing the supplemental form 
when it became available. 778 F.2d at 875. Similarly, in 
Satellite Broadcasting, the company met its deadline but filed 
in the wrong place because the rule described the filing 
location in a "baffling and inconsistent" way. 824 F.2d at 2-4. 
Here, the requirements of the rule admit of no such confu-
sion, as again is evident from 21st Century's timely payments 
for more than a year without claiming uncertainty about the 
amount of payment due. Nor can 21st Century prevail under 
the rationale of Gardner, where the petitioner lacked actual 
notice of the final decision and therefore missed the filing 
deadline. 530 F.2d at 1088-90. 21st Century had actual 
notice of its payment obligations independent of the Commis-
sion's January 2000 payment notice, and 21st Century's as-
serted confusion about what it owed is linked, according to its 
own correspondence with the Commission, to its lack of 
timely financing. Even if the payment notices contained 
errors, unlike Gardner, 21st Century knew that payments for 

the disaggregated C block licenses were half what they had 
been before disaggregation, knew that payment for its F 
block licenses were unchanged, was aware of the original 
amortization scheme, and had successfully met prior dead-
lines.

 In any event, 21st Century may not "turn a clerical error 
into a windfall of 'rights it would not otherwise enjoy.' " 
State of Oregon, 102 F.3d 583, 586 (D.C. Cir. 1996) (quoting 
Florida Inst. of Tech. v. FCC, 952 F.2d 549, 553 (D.C. Cir. 
1992)). 21st Century's first two post-default-cancellation let-
ters indicate that the reason 21st Century missed the pay-
ment deadline was because it was unable to arrange for 
timely financing; 21st Century sought a waiver of the auto-
matic cancellation rule not because of confusion about the 
amount it owed but because it was not in possession of 
sufficient funds to make timely payment. Furthermore, even 
if it was uncertain about the precise dollar amount, a prudent 
licensee would have attempted to make "a reasonable effort 
to comply," Florida Inst., 952 F.2d at 550. As the Commis-
sion states in its brief, "discrepancies in payment notices, 
even had they produced some genuine uncertainty, would 
hardly have justified 21st Century's decision to make no 
payment at all." Respondent's Br. at 39.

 Accordingly, the court dismisses the petition for review of 
automatic cancellation of the C block licenses for lack of 
standing, and denies the petition for review of automatic 
cancellation of the F block licenses, because 21st Century's 
hearing contentions are not properly before the court inas-
much as 21st Century failed to exhaust its administrative 
remedies by timely presenting its hearing arguments to the 
Commission, and 21st Century's notice contentions fail in 
light of record evidence that it had sufficient notice of its 
payment obligations.

 Williams, Senior Circuit Judge, concurring in part and 
dissenting in part: I agree with the majority opinion in every 
respect except the conclusion that we cannot decide the 
claims regarding the C block licenses. The majority may well 
be right in rejecting 21st Century's standing argument, but it 
does so on the basis of extremely sketchy briefing, resolving a 
number of substantive issues of communications law en route. 
This trip is not necessary. Under Steel Co. v. Citizens for a 
Better Environment, 523 U.S. 83 (1998), of course, a court 
faced with a difficult jurisdictional issue generally may not 
proceed to the merits without resolving that issue, even 
"where (1) the merits question is more readily resolved, and 
(2) the prevailing party on the merits would be the same as 
the prevailing party were jurisdiction denied." Id. at 93. 
But Steel Co. recognized an exception. Where the court 
actually decides the merits question "in a companion case," 
there is no need to address the jurisdictional question. Id. at 
98. In such a situation the disposition in the companion case 
"renders the merits in the present case a decided issue and 
thus one no longer substantial in the jurisdictional sense." 
Id. (quoting Norton v. Mathews, 427 U.S. 524, 530-31 (1976)). 
Here the disposition of the F block license claims totally 
resolves the merits on the C block licenses, as no merits 
difference exists between them. Since we plainly have juris-
diction over the F block claims, I see no reason not to employ 
the Steel Co. exception here.

 The rule in Steel Co. is driven by concern that otherwise 
courts would violate separation of powers by expounding on 
substantive issues of law where they lack jurisdiction. Steel 
Co., 523 U.S. at 101-02. Here the majority's failure to apply 
the exception ironically leads it to resolve sharply disputed 
and ill-briefed substantive issues. Of course the court always 
has jurisdiction to determine such questions as are necessary 
to determining its jurisdiction, so the court does not affirma-
tively violate Steel Co. But disregard of the Steel Co. excep-
tion leads it into quite unnecessary merits decisions, in ten-
sion with the case's basic message.

 Nor can I understand the reason proffered by the majority 
for non-application of the exception. See Maj. Op. at 7. It 
seems to be saying that the exception can apply only where 
the case of questionable jurisdiction is brought by a party 
different from the one bringing the other case. Nothing in 
Steel Co. suggests any such second-party requirement, and no 
reason for the requirement comes to mind. To the extent 
that the majority's wording suggests that different issues are 
raised with respect to the C and F blocks, that is simply not 
the case.