The **FLORIDA INSTITUTE OF TECHNOLOGY, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**
(Two Cases)

Nos. 89–1187, 91–1167.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 4, 1991.

Decided Jan. 10, 1992.

John Joseph McVeigh, for appellant. Clifford M. Harrington, Washington, D.C., also entered an appearance, for appellant.

Sue Ann Kanter, Counsel, Federal Communications Com'n, with whom Robert L. Pettit, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, Washington, D.C., were on the brief, for appellee.

Before MIKVA, Chief Judge, SILBERMAN and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The Florida Institute of Technology (the Institute) appeals from orders of the Federal Communications Commission rejecting as untimely the Institute's application for a construction permit for a new noncommercial educational FM (NCE FM) broadcast station and granting the mutually exclusive application of Palm Bay Public Radio, Inc. (Palm Bay). We affirm both orders.

I.

A.

In *Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945),

the Supreme Court held that the FCC must afford a comparative hearing to mutually exclusive applicants for a broadcast license. *See id.* at 333, 66 S.Ct. at 151; *see also* 47 U.S.C. § 309(e) (codifying *Ashbacker*'s hearing requirement). The Court implied, however, that the FCC might adopt administrative regulations such as filing deadlines to allow the orderly processing of such applications. *See Ashbacker*, 326 U.S. at 333 n. 9, 66 S.Ct. at 151 n. 9. The FCC, in response, has established various "cut-off" rules, so named because applicants filing before the deadlines are cut off from competition against late-filing parties.

The purpose of these rules is to attract all competitive applications for a particular broadcast channel within a fixed and reasonably short time frame, allowing the FCC to satisfy its *Ashbacker* obligations with a single, fairly prompt comparative hearing. *See RKO General Inc. (WNAC-TV)*, 89 F.C.C.2d 297, 320 (1982), *aff'd summarily sub nom. Atlantic Television Corp. v. FCC*, No. 82–1263 (D.C.Cir. Oct. 21, 1982). To promote this purpose and to ensure consistent and impartial treatment of applicants, the FCC has insisted on strict enforcement of the rules, even when this causes harsh results in particular cases. *See id.* at 321 n. 96; *Nazarene Theological Seminary Radio Corp. (KTSR)*, 52 Rad. Reg. (P & F) 559, 563 (Broadcast Bur.1982). We have consistently approved the FCC's hard-nosed rules, *see City of Angels Broadcasting, Inc. v. FCC*, 745 F.2d 656, 663 (D.C.Cir.1984), so long as "the *quid pro quo* for stringent acceptability criteria is explicit notice of all applicable requirements," *Salzer v. FCC*, 778 F.2d 869, 875 (D.C.Cir.1985). We therefore have held that the FCC was arbitrary and capricious when it rejected an application as untimely based on an ambiguous cut-off provision, not clarified by FCC interpretations, if the applicant made a reasonable effort to comply. *See, e.g., id.; Satellite Broadcasting Co. v. FCC*, 824 F.2d 1, 3–4 (D.C.Cir.1987).

The cut-off rules for NCE FM stations are quite straightforward. The FCC has reserved 21 radio channels for NCE FM broadcasting by qualified entities. *See* 47 C.F.R. §§ 73.501, 73.503. The allocation process begins when someone applies for a new or improved station whose specified signal contours will not conflict with existing NCE FM stations. *See id.* § 73.509. If this lead application is accepted for filing, the FCC issues a public notice that includes an "A" list and an "A" cut-off date. *See id.* § 73.3573(e). The "A" list identifies the lead application and any other applications that happen to have been filed by the notice date. The "A" cut-off date is the deadline (which cannot be less than 30 days after the notice) for the filing of any additional applications that are "mutually exclusive" with the "A" list applications, as well as any petitions to deny the "A" list applications. *Id.*

Under the FCC's longstanding interpretation of its cut-off rules, a potential applicant must file before the "A" cut-off date not only if its proposed signal *directly* conflicts with an "A" list applicant's signal, but also if its signal *indirectly* conflicts with an "A" list applicant's—that is, if it conflicts with some other new applicant's signal which in turn conflicts with an "A" list applicant's. *See Kittyhawk Broadcasting Corp.*, 7 F.C.C.2d 153, 154–55 (1967), *recon. denied*, 10 F.C.C.2d 160 (1967), *appeal dismissed sub nom. Cook, Inc. v. United States*, 394 F.2d 84 (7th Cir.1968). The *"Kittyhawk* doctrine" is the Commission's answer to the prospect of what is called a "daisy chain," a series of applications linked one to the other, with only the final one directly linked to the "A" list application that triggered the cut-off process. If the filing deadline for each link of a daisy chain were based on the filing date of the previous link rather than that of the lead application, "[i]n theory, at least, the chain might never end, and any attempt to establish cut-off dates would be nugatory." *Id.* at 155.

If the FCC receives no filings before the "A" cut-off date, the "A" list applicants are immune from additional competition, and the FCC can act on their proposals. When other applications are filed before the "A" cut-off date, however, they are placed on a "B" list announced in a second

public notice that sets a "B" cut-off date, which is the deadline for filing of all petitions to deny the "B" list applications as well as any minor amendments to either "A" or "B" list applications. *See* 47 C.F.R. § 73.3522(a)(2). Applications surviving this entire process are designated for a comparative hearing; if only one application survives, there is (obviously) no need for such a hearing.

### B.

On August 17, 1984, Central Florida Educational Network (Central Florida) applied for a new NCE FM station on Channel 212A in Melbourne, Florida. In accordance with the cut-off rules just described, the FCC issued a public notice on October 12 placing Central Florida on an "A" list and setting November 14 as the "A" cut-off date. One day before that deadline, Palm Bay filed an application that was mutually exclusive with Central Florida's. The Institute was apparently unaware of the public notice and so did nothing during this period.[1]

The normal next step for the FCC was to issue a "B" list naming Palm Bay, and if the "B" cut-off date passed uneventfully, to designate Palm Bay and Central Florida for a comparative hearing. This step was delayed, however, perhaps because the Commission was concluding its extensive proceedings concerning interference between NCE FM radio and Channel 6 television operations. In June 1985, the Commission finally released its *Channel 6 Order*, which among other things directed that all pending NCE FM applications be amended to conform to the new interference standards by October 1, 1985. *See Changes in the Rules Relating To Noncommercial, Educational FM Broadcast Stations*, 58 Rad.Reg.2d (P & F) 629, 639 [¶ 54] (1985). The order was careful to note, however, that "[a]pplications will not be returned to the beginning of the processing line due to the filing of these amendments." *Channel 6 Order* ¶ 54. Palm Bay amended its application on Sep-

tember 27, 1985, but Central Florida never responded to the order and its application was consequently dismissed for failure to prosecute on March 20, 1986. *See* 47 C.F.R. §§ 73.3566(b), 73.3568(b). As of early 1986, then, only Palm Bay remained as an applicant for the new NCE FM station; the Institute remained silently on the sidelines.

The FCC still had to issue a "B" list naming Palm Bay and establishing a period for the filing of petitions to deny Palm Bay's application. Instead, on September 22, 1986, the FCC staff mistakenly issued a new "A" list naming Palm Bay and setting October 23, 1986, as an "A" cut-off date for the filing of applications competitive with Palm Bay's. It was at this point that the Institute entered the picture, filing an application that was mutually exclusive with Palm Bay's one day before the new "A" cut-off date. A few months later, in January 1987, the FCC staff realized that it had made a mistake and returned the Institute's application as untimely, explaining that under *Kittyhawk*, because the Institute's proposal was indirectly linked (by Palm Bay's) to Central Florida's, it should have been filed before Central Florida's cut-off date of November 14, 1984. The Commission denied the Institute's application for review on February 14, 1989. *See Florida Inst. of Technology, Inc.*, 4 F.C.C.Rcd. 1549 (1989).

Two weeks later, the FCC staff finally issued a "B" list naming Palm Bay and setting a "B" cut-off date of April 4, 1989. Before that deadline, the Institute filed a petition to deny Palm Bay's application, attempting to clear the field and thus permit the whole process to begin again—with the Institute as a participant. The Institute contended that Palm Bay's amendment in response to the *Channel 6 Order* had destroyed Palm Bay's cut-off status and that in any event Palm Bay was not qualified for an NCE FM license. The Commission denied the Institute's petition and granted Palm Bay's application. *See Palm Bay Public Radio, Inc.*, 6 F.C.C.Rcd. 1772

---

1. The Institute was also apparently ignorant of the notices of application that Palm Bay published in local newspapers pursuant to 47 C.F.R. § 73.3580(c).

(1991). The Institute appeals both of the Commission's orders.

## II.

The Institute wishes to compete for the new NCE FM station that the Commission granted to Palm Bay. It is undisputed, however, that the Institute's application for that station was mutually exclusive with Palm Bay's and thus indirectly with Central Florida's. It is also undisputed that the Institute did not file its application until almost two years after November 14, 1984, the cut-off date for Central Florida and (under *Kittyhawk*) for Palm Bay, apparently because the Institute was simply unaware of the public notice announcing that cut-off date. The Institute must, then, overcome a substantial hurdle, because under the customary and clear-cut application of the NCE FM cut-off rules, the Institute's rights to a comparative hearing with Palm Bay were extinguished on November 14, 1984.[2] *See Ranger v. FCC,* 294 F.2d 240, 242 (D.C.Cir.1961). The Institute must convince us that, as a matter of law, the FCC's actions after that date excused the Institute's earlier failure to comply with the rules.

We are first told that the events relating to the Commission's *Channel 6 Order* destroyed Palm Bay's protected (cut-off) status. While acknowledging that paragraph 54 of the order protected applicants from "return[ing] to the beginning of the processing line" simply because they amended their applications to conform to the new standards, the Institute contends that the order said nothing specifically about, and

therefore had no effect on, the "cut-off status" of applicants (such as Palm Bay) who chose to make the type of major amendments that would normally eliminate cut-off status. *See* 47 C.F.R. § 73.-3573(b)(1). The Commission, however, explained that protecting existing applicants' cut-off status was exactly what it meant to do in paragraph 54, *see Palm Bay,* 6 F.C.C.Rcd. at 1773 & n. 7, and we defer to the Commission's construction of its own prior order unless there are "compelling indications that it is wrong," *City of Angels,* 745 F.2d at 661. There are no such indications here.[3]

We are similarly unpersuaded by the Institute's argument that the dismissal of Central Florida for not responding to the *Channel 6 Order* destroyed Palm Bay's cut-off status because the November 14, 1984, "A" cut-off date was based on Central Florida's lead application. The lead application does trigger the promulgation of an "A" list setting an "A" cut-off date, but under *Kittyhawk* that date then serves as the deadline for all directly and indirectly mutually exclusive applications as well. Thus, both the application(s) on the "A" list and all timely competitive applications are cut off from additional competition as of the "A" cut-off date; indeed, even if a later dismissal of or amendment to a linking application in a daisy chain "cures" an indirect conflict, the FCC will not reopen the application process. *See, e.g., Bill R. Wright,* 102 F.C.C.2d 1142, 1147–49 (1985). We have no doubt, then, that Palm Bay was cut off on November 14, 1984 and that

---

**2.** Although, as the Institute notes, the *"Kittyhawk"* doctrine" has not been applied to some FCC cut-off schemes, *see Sterling Recreation Org. Co.,* 80 F.C.C.2d 319, 322 (1980) (commercial television "table of assignments" system), *recon. denied,* 86 F.C.C.2d 804 (1981), the doctrine continues to apply with full force in the NCE FM context, *see id.* at 322 n. 7; *see also Bill R. Wright,* 102 F.C.C.2d 1142, 1146 (1985) ("[*Kittyhawk*] is inapplicable only in the full service television and commercial FM radio services, where allocation tables virtually eliminate the possibility of daisy chain situations."). If there were any doubt, the plain language of the public notice should have resolved it. The notice warned that applications were due by Novem-

ber 14, 1984, "in order to be considered with any application appearing on the attached list [such as Central Florida's] *or with any application on file by the close of business on November 14, 1984* which involves a conflict necessitating a hearing with any application on this list [such as Palm Bay's]" (emphasis added).

**3.** We note in this respect that the FCC's rules, like the *Channel 6 Order,* speak in terms of "file number[s]" and "place[s] in the processing line" rather than in the "cut-off" vernacular usually used in describing the processing system. *E.g.,* 47 C.F.R. § 73.3573(b), (e).

Central Florida's subsequent dismissal had no effect on that status.[4]

The core of the Institute's case, however, is its contention that the FCC staff's mistaken issuance in September 1986 of the new "A" list, rather than the "B" list appropriate under the cut-off rules, gave the Institute rights it would not otherwise enjoy.[5] This new "official notice," the Institute argues, effectively started the cut-off process over again, and this time the Institute applied on time. We do not agree. The new "A" cut-off date could not supplant the earlier one because the September 1986 notice was without legal effect: "[i]t is a 'well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action.'" *Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356, 1359 (D.C.Cir.1979) (quoting *Union of Concerned Scientists v. Atomic Energy Comm'n*, 499 F.2d 1069, 1082 (D.C.Cir. 1974)).

Even if it did not *abrogate* the earlier proceedings, the Institute claims, the second "A" list at least caused enough confusion and engendered enough detrimental reliance to oblige the FCC to *waive* the cut-off rules and accept the Institute's application. The Institute's waiver argument carried a heavy burden before the Commission, and it faces an even heavier one before us on appeal. *See, e.g., City of Angels*, 745 F.2d at 663; *cf. Reuters Ltd. v. FCC*, 781 F.2d 946, 950 (D.C.Cir.1986) (warning the FCC to avoid "*[a]d hoc* departures from [its] rules, even to achieve laudable aims").

The Commission has granted waivers from compliance with the cut-off rules, *see, e.g., The Denton Channel Two Foundation*, 85 F.C.C.2d 983 (1981), but only in "extreme cases involving extraordinary circumstances," *Nazarene*, 52 Rad.Reg.2d (P & F) at 563, and only when the untimely applicant has demonstrated that it acted with reasonable diligence and thus that its tardiness was attributable to circumstances beyond its control. *See id.; Bronco Broadcasting Co.*, 58 F.C.C.2d 909, 912 (1976). The Institute's failure to apply in response to the first "A" list, unfortunately for the Institute, was attributable only to its own ignorance. The Institute relies primarily on *Sterling Recreation Organization Co.*, 80 F.C.C.2d 319 (1980), in which the Commission granted a waiver to an indirectly mutually exclusive applicant who filed only after a second "A" list was inadvertently issued. The decision in *Sterling* was founded, however, on the holding that *Kittyhawk* did not apply to the cut-off system involved in that case; the confusion generated by the second "A" list was merely "[a]nother element" supporting the result. *Id.* at 322. We think that the Commission's explanation that it will consider such "additional element[s]" only in "non-*Kittyhawk* situations," *Florida Inst. of Technology*, 4 F.C.C.Rcd. at 1550, is therefore both rational and unsurprising.

Still, the Institute contends that "equity" and the "public interest" require the FCC to accept the Institute's untimely application. The Institute portrays itself as an "innocent" applicant whose "good faith reliance" on the second "A" list caused it substantial harm. The Institute, we are told, seeks only the opportunity to advance the real public interest by providing competition for Palm Bay, while Palm Bay hopes to capitalize on Central Florida's dismissal and the Commission's bureaucratic procedures to escape all competition.

The Commission recognized that this portrayal of both the equities and the public

---

**4.** The public notice that Central Florida had been dismissed did, however, eliminate Central Florida's own cut-off status. *See Dogwood B/casting Corp.*, 47 Rad.Reg.2d (P & F) 1352, 1354 (1980).

**5.** The Institute contends that the promulgation of the second "A" list may not have been a "mistake" at all if the FCC staff believed (like the Institute) that Palm Bay's amendment or Central Florida's dismissal had eliminated Palm Bay's cut-off status and, thus, that issuance of a new "A" list was required. The Institute has presented no evidence, however, in support of this reading of the staff's motivation, and we therefore accept the Commission's reasonable explanation of its staff's actions. In any event, since the Commission ultimately rejected the arguments that Palm Bay's cut-off status had been destroyed, even if the staff did act for the reasons the Institute states, it acted erroneously.

interest strays far from reality. The Institute is "innocent" only if one starts near the end of the story (as the Institute is wont to do)—*after* the Institute's lack of diligence caused it to miss the November 14, 1984, cut-off date and lose its rights to a comparative hearing with Palm Bay. Thus, even assuming that the Institute's reliance on the erroneously promulgated second "A" list was reasonable, the Institute's detriment is limited to the cost of its application. Palm Bay, in contrast, has at all times complied with the cut-off rules and, as the Commission (and this court) has long recognized, such diligent applicants have a legitimate expectation that the cut-off rules will be enforced. *See City of Angels,* 745 F.2d at 663 ("[The cut-off rules aid] timely broadcast applicants by granting them a 'protected status' that allows them to prepare for what will often be an expensive and time-consuming contest, fully aware of the competitors they will be facing." (citation omitted)); *see also RKO General,* 89 F.C.C.2d at 320–21. Of course, timely applicants have no "vested right against challenge from untimely competitors," in the sense of precluding the FCC from ever granting a cut-off waiver, but they certainly have an equitable interest whose weight it is "manifestly within the Commission's discretion to consider." *City of Angels,* 745 F.2d at 663 n. 7. We cannot quarrel, then, with the FCC's refusal to permit "[the Institute's] late-filed application ... to have equal footing with [Palm Bay,] who has proceeded diligently." *Florida Inst. of Technology,* 4 F.C.C.Rcd. at 1551.

Nor do considerations of the public's interest in competition oblige us to hold that the Commission is required to issue a waiver. To be sure, the public has a "palpable" interest in widespread competition for broadcast licenses, *Radio Athens, Inc. (WATH) v. FCC,* 401 F.2d 398, 401 (D.C.Cir.1968), and strict enforcement of the cut-off rules in this case results in Palm Bay facing no competition for the new NCE FM station. But the countervailing consideration is not, as the Institute claims, mere "administrative convenience." The essential basis of the cut-off rules is,

rather, the public's interest in having broadcast licenses issued (and service provided) without undue delay, an interest, in other words, in administrative *finality.* " 'There must be some point in time when the Commission can close the door to new parties to a competitive hearing or, at least hypothetically, no licenses could ever be granted.' " *City of Angels,* 745 F.2d at 663 (quoting *Radio Athens,* 401 F.2d at 401); *see also RKO General,* 89 F.C.C.2d at 319. The Commission weighed these various interests and decided that, "[o]n balance, the best course is to properly apply our processing rules and let the burden of such action fall where it may." *Florida Inst. of Technology,* 4 F.C.C.Rcd. at 1551. The burden of the FCC's decision to deal with its mistake by adhering to its customary policy of strict enforcement of the cut-off rules does fall on the Institute, but because the Institute's detrimental reliance on that mistake was minimal, so is the burden. The Institute has failed to convince us that the Commission's reasons for its decision were insubstantial, that it arbitrarily deviated from precedent, or that its denial of the requested waiver was otherwise an abuse of discretion. *See Green Country Mobilephone, Inc. v. FCC,* 765 F.2d 235, 238 (D.C.Cir.1985); *City of Angels,* 745 F.2d at 663.

We turn to the merits. The Institute argues that Palm Bay is unqualified to serve as an NCE FM broadcaster because Palm Bay's application did not propose an adequate educational goal and commitment to educational programming. *See Eligibility for Noncommercial Educational FM and TV Broadcast Station Licenses,* 43 Fed.Reg. 30842, 30844–45 (July 18, 1978) (establishing standards for NCE FM proposals). In fact, Palm Bay proposed to educate and develop local performing artists and to educate listeners about veterans' benefits, among other things, thus distinguishing this case from those on which the Institute relies. *See, e.g., Earlimart Educ. Found., Inc.,* 6 F.C.C.Rcd. 528, 529 (Mass Media Bur.1991) (rejecting an applicant that proposed to provide only "vocational broadcast training"). The numerous

spelling and grammatical errors in Palm Bay's short proposal might make us speculate as to how well Palm Bay will serve as a noncommercial *educational* FM broadcaster, but we cannot say that the Commission's decision that Palm Bay is qualified under the existing FCC rules and the governing statute was unreasonable.

\*     \*     \*     \*     \*     \*

The Institute's other arguments are without merit. For the reasons stated above, the two FCC orders are

*Affirmed.*