# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 10, 2005          Decided August 5, 2005

No. 04-1031

CHARLES CRAWFORD,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

———

On Petition for Review of an Order of the
Federal Communications Commission

———

*Gene A. Bechtel* argued the cause and filed the briefs for petitioner.

*Stanley R. Scheiner*, Attorney, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Robert H. Pate*, Assistant Attorney General, *Catherine G. O'Sullivan* and *Andrea Limmer*, Attorneys, *John A. Rogovin*, General Counsel, *Austin C. Schlick*, Deputy General Counsel, and *Daniel M. Armstrong*, Associate General Counsel. *Gregory M. Christopher*, Counsel, entered an appearance.

Before: RANDOLPH, TATEL, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Charles Crawford petitions for review of the Federal Communications Commission's dismissal of two proposals he filed to amend the Commission's Table of Allotments for FM radio channels. Crawford's principal contention is that he lacked notice that his proposals could be precluded by another applicant's earlier-filed submission. With respect to one of Crawford's proposals, we dismiss his petition as moot. With respect to the other, we conclude that Crawford received adequate notice and therefore deny the petition.

I

The Federal Communications Commission (FCC) uses a two-stage process to allocate commercial FM radio frequencies to broadcasters. First, a frequency must be allocated to a particular community in the FM Table of Allotments. Second, a prospective broadcaster may then apply for a license or construction permit for that frequency in that community.

The Table of Allotments can be amended only by rule. *See Amendment of Part 1, Subpart C (Rulemaking Proceedings), Rules of Practice and Procedure*, 39 Fed. Reg. 44,020, 44,020 (Dec. 20, 1974); *see also* 47 C.F.R. § 1.420. The process begins with an FCC notice of proposed rulemaking (NPRM), often in response to a broadcaster's petition. The notice sets forth the proposed change -- for instance, "allot channel 229C at Houston" -- and announces periods for initial comments and reply comments.[1] During the initial comment period, the FCC

---

[1] In the Table of Allotments, each channel allocated to a particular community is identified by a number between 221 and 300, which designates the frequency. This number is followed by the station's class; possible classes are A, B1, B, C3, C2, C1, C0, and C, with each

accepts comments on the initial proposal. It also accepts counterproposals that are "mutually exclusive" with the initial proposal.[2] *See* 47 C.F.R. § 1.420(d); *see also, e.g.*, *Implementation of BC Docket No. 80-90 to Increase the Availability of FM Broadcast Assignments*, 5 F.C.C.R. 931, ¶ 4 n.5 (1990) ("*Implementation of BC Docket No. 80-90*").

Because one amendment to the Table of Allotments may be possible only if another amendment is made, broadcasters commonly submit proposals or counterproposals that include multiple amendments. In a given docket, the FCC considers the initial proposal and any counterproposals that are filed during the initial comment period. Also treated as counterproposals are any ostensibly freestanding proposals that conflict with the initial proposal or with other counterproposals -- as long as they are filed before the end of the initial comment period. *See, e.g.*, *Notice of Proposed Rule Making, Amendment of Section 73.202(b), Table of Allotments, FM Broadcast Stations*, 17 F.C.C.R. 5944, 5948 (2002); *Amendment of Section 73.202(b), Table of Allotments, FM Broadcast Stations*, 16 F.C.C.R. 14,085, 14,085-86 (2001); *see also* 47 C.F.R. § 1.420(d).

After the initial comment period, any proposals that are mutually exclusive with those considered in the proceeding are "cut off" from consideration pursuant to 47 C.F.R. § 1.420(d),

---

class designation signifying maximum and minimum signal strengths and antenna heights. Thus, channel 229C designates frequency 93.7, class C. *See* 47 C.F.R. §§ 73.201-.202, .211(a)-(b).

[2]Generally, two proposals are mutually exclusive if channels that they propose would violate the FCC's prescribed minimum distances between stations of given classes and separations on the FM spectrum. *See* 47 C.F.R. §§ 73.207(a)-(b). The purpose of these prescriptions is to limit signal interference.

which states: "Counterproposals shall be advanced in initial comments only and will not be considered if they are advanced in reply comments." This means that during the reply comment period, comments can be filed on counterproposals submitted during the initial comment period -- but further counterproposals cannot be filed. *See id.*

The impetus for this kind of cutoff rule derives from *Ashbacker Radio Corp. v. FCC*, 326 U.S. 327 (1945), which held that mutually exclusive broadcast applications must receive a comparative hearing. *See id.* at 330-31. As this Circuit explained in *Ranger v. FCC*, 294 F.2d 240 (D.C. Cir. 1961):

> Obviously, if all valid conflicting pending applications must receive a comparative hearing, late filings create procedural difficulties. Particularly is this so in view of what is described in this litigation as a chain reaction. Let us assume three towns, A, B and C, fifty miles apart in a straight geographical line. Application for a broadcast station at A is made. Grant of that application would preclude a station at B on the same or an adjacent channel; it would not affect the possibility of a station at C. Before the application for A has been acted upon, an applicant files for a license at B and asks for a comparative hearing with A. A grant in B would preclude a station at C. Therefore potential applicants for C must file in the A-B case in order to protect their rights. Theoretically this reaction could go on indefinitely and could eventually involve every potential broadcast-station situs in the United States.

*Id.* at 243. And as we further noted in *Florida Institute of Technology v. FCC*, "[i]f the filing deadline for each link of a daisy chain" of applications like that described above "were

based on the filing date of the previous link rather than that of the lead application, '[i]n theory, at least the chain might never end.'" 952 F.2d 549, 550 (D.C. Cir. 1992) (quoting *Kittyhawk Broadcasting Corp.*, 7 F.C.C.2d 153, 155 (1967)) (second alteration in original).

By setting a firm deadline for the filing of conflicting proposals, the FCC's cutoff rule prevents this kind of daisy chain of applications from going on indefinitely. This circuit has repeatedly invoked the daisy-chain rationale in upholding the FCC's application of cutoff rules in different broadcast contexts. *See, e.g.*, *Florida Inst. of Technology*, 952 F.2d at 549-52; *Ranger*, 294 F.2d at 243-44. We have not, however, previously addressed such rules in the context of an FM allotment rulemaking proceeding.

On July 13, 2000, NationWide Radio Stations petitioned the FCC to allot FM channel 233C3 at Quanah, Texas. On August 18, the FCC issued an NPRM proposing this change and setting October 10, 2000 as the deadline for initial comments and October 25, 2000 as the reply comment deadline. *See Notice of Proposed Rule Making, Amendment of Section 73.202(b), Table of Allotments, FM Broadcast Stations*, 15 F.C.C.R. 15,809, 15,812-13 (2000) ("*Quanah NPRM*"). It also set out the FCC's rules for counterproposals, including the cutoff rule. *Id.* at 15,813.

On October 10, 2000, the last day of the initial comment period and thus the last day to submit a counterproposal, a group of broadcasters (the "Joint Parties") filed a counterproposal that included twenty-two changes to the Table of Allotments. This counterproposal conflicted with NationWide's proposal for Quanah because it proposed allotting the same channel at a nearby location. Due to a clerical error, the FCC did not place the Joint Parties' counterproposal in its database or otherwise

make it public.[3]

On May 18, 2001, Charles Crawford -- the petitioner in this case -- asked the FCC to allot channel 257C2 at Benjamin, Texas. One week later, Crawford filed a second proposal, seeking to allot channel 249C3 at Mason, Texas. Each of these proposals conflicted with a piece of the Joint Parties' counterproposal in the Quanah proceeding, and so should have been precluded under the FCC's cutoff rule. The FCC, however, mistakenly docketed Crawford's proposals and issued an NPRM for each.

During the initial comment period for Crawford's proposals, the FCC realized that it had not given notice of the Joint Parties' counterproposal. Thereafter, it issued such notice. The notice stated that the FCC would consider the counterproposal as part of the Quanah proceeding, and it set a deadline for reply comments.

On June 14, 2002, the FCC Media Bureau's Audio Division dismissed both of Crawford's petitions as precluded by the Joint Parties' counterproposal. The Bureau explained that even though the counterproposal had not been publicized immediately, it had been submitted before the end of the initial

---

[3]In the counterproposal, the Joint Parties observed that the FCC could resolve the conflict by allotting channel 255C3 at Quanah, instead of channel 233C3. NationWide, having been served with the Joint Parties' counterproposal, agreed to that resolution. When it later became clear that channel 255C3 was not actually available for Quanah, however, NationWide withdrew its expression of interest in *any* channel, stating that it "did not wish to be placed in an advers[a]rial position in such a complex proceeding with so many larger interests at stake." NationWide Withdrawal of Expression of Interest at 1-2 (J.A. 88-89).

comment period for the Quanah proposal, and it therefore precluded late-filed conflicting proposals. Crawford petitioned for reconsideration, claiming principally that the Quanah NPRM provided him with insufficient notice that his proposals could be precluded by a proposal as complex as that of the Joint Parties. After this petition was denied, *Amendment of Section 73.202(b), Table of Allotments, FM Broadcast Stations*, 18 F.C.C.R. 103, 106 (2003) ("*Media Bureau Reconsid. Mem. Op. & Order*"), Crawford submitted an application for review by the full Commission. The FCC denied that petition, *Amendment of Section 73.202(b), Table of Allotments, FM Broadcast Stations*, 19 F.C.C.R. 470, 470-71 (2004) ("*Commission Mem. Op. & Order*"), and Crawford petitioned for review in this court.

## II

Before confronting the merits of Crawford's petition for review, we must consider whether this case is moot. As Crawford notes, the Joint Parties have withdrawn the piece of their proposal that conflicts with his proposed Benjamin allotment. *See* Pet'r Reply Br. at 7-8. For this reason, Crawford's brief acknowledged that "there is no longer an active controversy" with respect to the Benjamin proposal. *Id.* at 8; *see also id.* at 8-9 (arguing for jurisdiction only with respect to the Mason proposal). Although Crawford sought to resurrect his Benjamin claim at oral argument, his initial position was correct.

Crawford's claim regarding the Mason proposal may also soon become moot. For reasons unrelated to the issues before this court, the Media Bureau has dismissed the Joint Parties' counterproposal and denied the Joint Parties' petition for reconsideration of that decision. *See* Resp't Br. at 7 & n.15. But the decision has not yet become final, and Crawford's Mason proposal remains precluded. *Id.* The controversy as to Mason thus remains a live one. We proceed, then, to consider

the merits of Crawford's petition only with respect to the Mason proposal.

## III

Crawford's principal contention is that he lacked notice that his proposal could be precluded by the Joint Parties' submission. He also contends that the FCC failed to adequately set forth its rationale for denying his petition, and that the FCC should have rejected the Joint Parties' counterproposal as the product of impermissible collusion between the Joint Parties and NationWide. We consider these challenges below.

## A

The Administrative Procedure Act provides that an agency that conducts an informal rulemaking typically must publish "[g]eneral notice of proposed rule making . . . in the Federal Register." 5 U.S.C. § 553(b). The same section further provides that, "[a]fter notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(c). The parties agree that these requirements apply to FCC rulemaking proceedings to amend the FM Table of Allotments.

The notice-and-comment requirements presume that the contours of the agency's final rule may differ from those of the rule it initially proposes in an NPRM. It is well-settled that an agency need not initiate a new notice-and-comment period as long as the rule it ultimately adopts is a "logical outgrowth" of the initial notice. *E.g.*, *First Am. Discount Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000); *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991); *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1031 (D.C.

Cir. 1978). Whether the "logical outgrowth" test is satisfied depends, in turn, on whether the affected party "should have anticipated" the agency's final course in light of the initial notice. *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983).

Here, Crawford claims that the preclusive effect of the Joint Parties' counterproposal on his Mason petition was not a logical outgrowth of the Quanah NPRM. The Joint Parties' counterproposal, he argues, was simply too complex for preclusion of the Mason proposal to have been "reasonably foreseeable," Pet'r Br. at 17, by virtue of that NPRM. How did that counterproposal conflict both with the Quanah proposal (so as to receive cutoff protection in the Quanah proceeding) and with the Mason proposal (so as to preclude it)? The Joint Parties proposed a change at Keller, Texas; this change necessitated a "chain reaction" of amendments, the third of which conflicted with the Quanah proposal. The Keller change also spurred an additional chain reaction of amendments, the sixth of which conflicted with the Mason proposal.

Despite the complexity of this "Texas Nine-Step," we reject Crawford's contention that he lacked adequate notice, for two reasons. First, Crawford presumes that the logical-outgrowth test requires that an affected party be able to anticipate the specific preclusive outcome of an allotment proceeding. But the Quanah NPRM, as well as the FCC's regulations, made clear that the proceeding would encompass mutually exclusive counterproposals and that late-filed conflicting proposals would be cut off. *See Quanah NPRM*, 15 F.C.C.R. at 15,814; 47 C.F.R. § 1.420(d). This put all interested parties on notice that their proposals could be precluded by *any* counterproposal -- whether foreseeable or not -- that was filed by the deadline, mutually exclusive with the Quanah proposal, and mutually exclusive with their own. *See Commission Mem. Op. & Order*,

19 F.C.C.R. at 471 & n.6. Thus, when the FCC deemed Crawford's proposal precluded, that was more than just a "logical outgrowth" of the Quanah NPRM. Rather, the FCC was "merely doing that which [it] announced" it would do. *Media Bureau Reconsid. Mem. Op. & Order*, 18 F.C.C.R. at 104. The FCC's cutoff rule puts prospective broadcasters on notice that they should file their proposals as soon as they are ready -- or risk being precluded by an earlier-filed proposal or counterproposal that has received cutoff protection. Indeed, the FCC has made this point on several previous occasions.[4]

Second, even if the logical-outgrowth test *did* require that an affected party be able to anticipate a preclusive outcome in a particular allotment proceeding, that test would be satisfied here. In light of the FCC's minimum distance separation requirements, Crawford should at least have known that NationWide's initial proposal to allot channel 233C3 at Quanah could conflict with a counterproposal that included only a single channel up to 147 miles away.[5] Such a channel, in turn, could

---

[4]*See Conflicts Between Applications and Petitions for Rulemaking to Amend the FM Table of Allotments*, 8 F.C.C.R. 4743, 4745 (1993) (noting that the risk of preclusion "could in large part be minimized by filing a counterproposal at the earliest possible time"); *Amendment of Section 73.202(b), Table of Allotments, FM Broadcast Stations*, 5 F.C.C.R. 7609, ¶ 10 (1990) ("*Pinewood*") (holding that, to "avoid possible preclusion . . . , other applicants must file by the comment deadline stated in the notice of proposed rule making in the allotment proceeding"); *see also id.* ¶ 8 ("The fact that we may allot an alternate channel to . . . any community in [the] proceeding, which in turn, would cause the exclusion of the [applicant's] proposal as an untimely conflicting proposal from the proceeding, is merely doing that which we announced that we could do.").

[5]*See* 47 C.F.R. § 73.207(b)(1) tbl.A (providing that, absent exceptions not relevant here, the minimum permissible distance

have conflicted with another class C3 channel -- the same class as the channel Crawford proposed for Mason -- as far away as another 147 miles. Thus, the foreseeable radius of conflict arising from even such a simple proposal was 294 miles from Quanah.[6]

Mason is just 192 miles from Quanah, well within this 294-mile radius. *See* Pet'r Br. at 16. Thus, far from having to follow the "labyrinthine trail" of the Joint Parties' counterproposal, *id.* at 5, Crawford could reasonably have anticipated the preclusive effect of the Quanah proposal simply by postulating a single-channel counterproposal between the two cities. And had he done so, he could have safeguarded his own proposal from preclusion by filing it during the initial comment period.

Our conclusion that notice was adequate is unaffected by the FCC's delay in entering the Joint Parties' counterproposal into its database or otherwise making it public. Under the

---

between a class C3 station and a class C station -- the class with the largest signal contour -- on the same channel is 147 miles).

[6] Even if the stations proposed for Mason and Quanah were too far apart on the spectrum for any third station to conflict with both of them, the FCC has long made clear that it may resolve a conflict between two proposals by giving one community a different channel than the one proposed for it. *See, e.g.*, *Quanah NPRM*, 15 F.C.C.R. at 15,814 ("The filing of a counterproposal may lead the Commission to allot a different channel than was requested for any of the communities involved."); *Pinewood*, 5 F.C.C.R. ¶ 8 ("Because a notice of proposed rule making in a channel allotment proceeding specifically elicits counterproposals and alerts all interested parties that alternate channels may be substituted for either the original proposal or the counterproposal, both the actual counterproposal advanced by the proponent and any alternate channel are within the scope of the notice.").

FCC's cutoff rule, Crawford was precluded from filing his Mason proposal after the close of the Quanah initial comment period because the Joint Parties had filed their counterproposal during that period. Preclusion did not depend upon public notice of the counterproposal. Nor would notice have helped Crawford, since the Joint Parties did not file their counterproposal until the last day of the period (as the rule permitted), after which it was too late for Crawford to take effective action -- even if he had received notice of the counterproposal. The notice that truly mattered in this case was the Quanah NPRM, which the FCC filed on August 18, 2000. As discussed above, that notice apprised Crawford that the only way he could reliably protect himself was to file his Mason proposal within the initial comment period that followed the NPRM. It was Crawford's failure to act during that period that doomed his proposal. *Cf. Kittyhawk*, 7 F.C.C.2d ¶ 4 (holding that, because the "Commission's interpretation of the cutoff rule has remained constant since its inception," the applicant "knew or should have known that an intervening proposal filed on the last possible day could act to deny him consolidation").

Crawford's position is not improved by the FCC's mistaken, but short-lived, docketing of his Mason proposal. As we have held in a similar factual setting, "an agency's failure to follow its own regulations is fatal to the deviant action." *Florida Inst. of Technology*, 952 F.2d at 553 (internal quotation marks omitted). Thus, the FCC's erroneous docketing of the Mason proposal did not give Crawford any "rights he would not otherwise enjoy." *Id.*; *see also 21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192, 202 (D.C. Cir. 2003) (holding that the petitioner may not "turn a clerical error into a windfall of rights it would not otherwise enjoy" (internal quotation marks omitted)). Nor did Crawford detrimentally rely on the agency's failure to follow its own regulations. Rather, we agree with the FCC that "[a]t most, Mr. Crawford was misled into thinking he

could file his proposals when he subsequently thought of them, whereas they had long since been precluded." Resp't Br. at 18-19.

B

Crawford next argues that the Commission's Order failed to adequately set forth its reasoning for upholding the dismissal of his proposal. He insists that the daisy-chain rationale discussed in Part I above and relied upon in the FCC's brief is merely a post hoc rationalization by the agency. This contention also fails.

First, the Commission's order made clear that the dismissal of Crawford's proposal was dictated by application of the cutoff rule. *See Commission Mem. Op. & Order*, 19 F.C.C.R. at 470-71 & n.3. It was the cutoff rule, not the rationale for the rule, that was the basis for the preclusion of the Mason proposal. The cutoff rule specifically applicable to amendment of the FM Table of Allotments has been in effect since 1974. *See Amendment of Part 1, Subpart C (Rulemaking Proceedings)*, 39 Fed. Reg. at 44,021. And as discussed in Part I, the underlying rationale for the FCC's cutoff rules is well-recognized and oft-repeated.[7]

Second, even if the FCC were required to explain the basis

---

[7]*See Florida Inst. of Technology*, 952 F.2d at 549-52; *Ranger*, 294 F.2d at 243-44; *see also Conflicts Between Applications and Petitions for Rulemaking to Amend the FM Table of Allotments*, 8 F.C.C.R. at 4744-45; *Conflicts Between Applications and Petitions for Rulemaking to Amend the FM Table of Allotments*, 7 F.C.C.R. 4917, ¶¶ 1, 3-4, 8, 17 (1992); *Pinewood*, 5 F.C.C.R. ¶ 12; *Implementation of BC Docket No. 80-90*, 5 F.C.C.R. ¶ 4 & n.6; *Kittyhawk*, 7 F.C.C.2d ¶ 4.

for the cutoff rule itself, we think it adequately did so.  The decision under review in this case stated that "[a]llotment cut-off procedures *and the need for these procedures* are clear and well established." *Commission Mem. Op. & Order*, 19 F.C.C.R. at 471 (emphasis added).  In support of that proposition, it cited (inter alia) an earlier Commission decision, *see id.* at 471 n.5 (citing *Pinewood*), which itself cited *Ashbacker* and discussed the need for a cutoff rule to prevent "the continuous filing of proposals," *Pinewood*, 5 F.C.C.R. ¶ 12.  Given this circuit's repeated recognition of the daisy-chain rationale, we have no difficulty apprehending the shorthand reference.  And as we have previously observed, "[i]f the necessary articulation of basis for agency action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, we will make the reference." *Committee to Save WEAM v. FCC*, 808 F.2d 113, 118 (D.C. Cir. 1986) (internal quotation marks omitted); *see Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 807 (1973) ("An agency may articulate the basis of its order by reference to other decisions." (internal quotation marks omitted)).[8]

## C

Finally, Crawford contends that the Joint Parties'

---

[8]Relatedly, Crawford cites a footnote in *Florida Institute of Technology* for the proposition that the cutoff rule is inapplicable "where allocation tables virtually eliminate the possibility of daisy chain situations." 952 F.2d at 552 n.2 (internal quotation marks omitted).  Closer examination makes clear, however, that the quotation refers only to applications for channels that already have been allotted to particular communities (so that there is no daisy-chain problem), and not to petitions to amend the table of allotments in the first instance.  *See id.*; *Pinewood*, 5 F.C.C.R. ¶¶ 8, 12; *Implementation of BC Docket No. 80-90 to Increase Availability of FM Broadcast Assignments*, 2 F.C.C.R. 1290, ¶¶ 8-9 (1987).

counterproposal had "suspect bona fides," such that the FCC should have treated it as the product of impermissible collusion between the Joint Parties and NationWide. Pet'r Br. at 22; *see id.* at 11-13, 22-23. But Crawford offers nothing to support these allegations, other than speculation based on NationWide's subsequent withdrawal of its expression of interest. *See supra* note 3. In rejecting that speculation, the FCC relied on a certification filed by the Joint Parties, under oath, denying that there were any agreements made or consideration exchanged between the Joint Parties and NationWide. Certifications of No Consideration (J.A. 97-102); *see Commission Mem. Op. & Order*, 19 F.C.C.R. at 471; *Media Bureau Reconsid. Mem. Op. & Order*, 18 F.C.C.R. at 105. We have no grounds for second-guessing the FCC's decision to accept that denial.

IV

For the foregoing reasons, we dismiss Crawford's petition for review as moot with respect to the Benjamin proposal. Although the petition is not moot with respect to the Mason proposal, we deny that aspect of the petition on the merits because Crawford received adequate notice that the proposal could be precluded.

*So ordered.*