In the

# United States Court of Appeals
## For the Seventh Circuit

No. 11-2112

IN RE:

FORT WAYNE TELSAT, INC.,

*Debtor-Appellee*.

APPEAL OF:

JAS PARTNERS, LTD.

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:10-cv-00303-TLS—**Theresa L. Springmann**, *Judge*.

ARGUED OCTOBER 17, 2011—DECIDED NOVEMBER 23, 2011

Before BAUER, POSNER, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal requires us to explore the duty of a trustee in bankruptcy to prosecute uncertain claims for the recovery from third parties of assets allegedly owned by the bankrupt estate.

Indiana University had what is called an "Instructional Television Fixed Service" license, which had been issued by the Federal Communications Commission and authorized the university to broadcast on specified frequencies.

Licenses of ITFS frequencies are available only to not-for-profit entities, such as the university, and mainly enable the licensee to broadcast educational materials to high schools and branch campuses within a 35-mile radius of the licensee's transmitter. See 47 C.F.R. § 74.903(a)(5) (2003). (The ITFS program has been replaced by EBS—the "Educational Broadband Service," §§ 27.1200 *et seq.*—but it appears to be similar. See §§ 27.1214 (a)(1), (d).) But a licensee who doesn't use all the frequencies that it's authorized to use can lease the unused ones to a for-profit entity.

Enter the parties. The debtor (that is, the bankrupt), Fort Wayne Telsat, was a television broadcaster in Indiana. Its principal unsecured creditor was (and is) the appellant, JAS Partners, Ltd., which was owed 85 percent of the total amount owed to the unsecured creditors. JAS's general partner, James A. Simon, is the debtor's founder and president. It is unclear just what JAS Partners does besides "funneling funds from other corporate entities to Mr. and Mrs. Simon for their personal use under the guise of loans to avoid tax consequences." *United States v. Simon*, No. 3:10-CR-00056(01)RM, 2011 WL 924264, at *2-3 (N.D. Ind. Mar. 14, 2011). Both the debtor and JAS are for-profit enterprises.

The university had agreed to transfer its license to another not-for-profit broadcaster, the Fort Wayne Public Broadcasting Service (which the parties call PBS). The FCC was contemplating "use it or lose it" regulations that would divest ITFS licensees of their licenses if they broadcast less than a specified minimum amount

of educational programming, and the university didn't think it could satisfy the new requirement and preferred to assign its license to PBS for nothing than lose it to the FCC. In anticipation of the assignment, PBS had agreed to lease to the debtor a substantial portion of the broadcasting rights conferred by the license. (Later PBS "quitclaimed its rights under the license to the debtor.) Such a lease would be an asset of the debtor, and would thus increase the amount of money that JAS could expect to receive as the debtor's principal unsecured creditor.

The university denied that it had transferred its license to PBS. But believing that the transfer had gone through or would go through, the debtor modified broadcasting equipment at a cost of $350,000. The trustee in bankruptcy filed a claim against the university contending that it had promised PBS the license, that the debtor had reasonably relied on the promise in making the equipment modifications, and that the doctrine of promissory estoppel entitled the debtor to damages of $116,000—the trustee's estimate of the unre-coverable costs incurred by the debtor to make the equip-ment modifications relating to the anticipated license.

The debtor was not a promisee, that is, was not a party to the yet-to-be performed contract between the university and PBS to transfer the license. But PBS's contingent lease to the debtor had made the debtor an intended third-party beneficiary of that contract, a relationship that can support a claim of promissory estoppel. *First Nat'l Bank of Logansport v. Logan Mfg. Co.*, 577 N.E.2d 949, 954 (Ind.

1991); *Arthur Andersen LLP v. Carlisle*, 129 S. Ct. 1896, 1902 (2009); *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996) (Indiana law); *Restatement (Second) of Contracts* § 90, comment c (1981). Anyway, though promissory estoppel is mainly a doctrine of contract law that allows reasonable reliance to be substituted for the normal requirement that to be enforceable a promise be in exchange for consideration (though the consideration could consist just of a reciprocal promise), it is sometimes applied to promises that would not be enforceable under contract-law principles even if they were supported by consideration. *Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698, 702-04 (7th Cir. 2004) (Indiana law).

Whether the trustee's promissory estoppel claim was strong or weak, the university settled it for $100,000. But the trustee did not obtain as part of the settlement (or even seek) the assignment of the license to the debtor. He had concluded that although PBS had quitclaimed its interest in the license to the debtor (or as much of the interest as the law permitted it to quitclaim), the quitclaim had conveyed nothing because the university's license had never actually been assigned to PBS.

Because, if the bankruptcy court approved the settlement, the debtor's estate would have insufficient assets to pay the unsecured creditors, JAS asked the court to reject it. See Fed. R. Bankr. P. 2002(a)(3), 9019(a); *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25, 434 (1968); *National Surety Co. v. Coriell*, 289 U.S. 426, 436-37 (1933) (Brandeis, J.); *In re Doctors Hospital of Hyde Park, Inc.*, 474

F.3d 421, 425-26 (7th Cir. 2007). It argued that the trustee had failed to use due care to maximize the assets of the debtor's estate; he had not adequately investigated the possibility of obtaining the license, which JAS estimates to be worth $4.1 million, as that was the amount the university had been offered earlier for it.

That's *much* too high an estimate of the value that the license would have to the debtor. To acquire *any* rights under the license, the debtor first would have had to find a nonprofit entity to be the licensee, would have had to secure the FCC's approval of the assignment of the license to PBS (a protracted process if the university resisted), and would have been entitled only to use so much of the licensed frequency band as the licensee did not use. And $4.1 million was a price that had been offered for the license as a part of a package of licenses, and bundles of such licenses are more valuable than the sum of the prices of the licenses if sold separately. Moreover, it was a price that had been offered to the university months before the settlement, and during the interval the prices of such licenses had plummeted, having spiked earlier only because of a contemplated merger among ITFS licensees each seeking to enlarge its broadcasting rights as a way of gaining leverage in merger negotiations.

In the face of these considerations, the trustee estimated the value of the license to the debtor to be only $600,000, and that was a reasonable estimate. It is not a negligible amount of money and so he *considered* pressing the theory that PBS was the real owner of the

license and so could assign rights encompassed by it. But after investigating, and receiving a certificate from the FCC stating that the license was owned by the university, he decided to abandon the theory. JAS opposed abandonment but the bankruptcy judge conducted a hearing and concluded that the trustee had acted prudently in settling the debtor's entire claim against the university for $100,000. The district judge agreed, precipitating JAS's appeal to us.

JAS contends that if only the trustee had spent a mere $20,000 on pretrial discovery, he would have learned that, despite the certificate from the FCC, PBS *did* have a valid claim to the license after all and that the license really *was* worth $4.1 million to JAS (this we know is not true), and he could have sued the university for that amount (or asked for specific performance—an order that the university transfer the license to PBS for the benefit of JAS) and had he done so would have obtained a favorable judgment.

Rather than taking the circuitous route of challenging the settlement, JAS could at the outset have asked the trustee to assign the debtor's rights against the university to JAS and the other unsecured creditors rather than litigating them himself. An FCC license is an assignable asset of a debtor's estate, *Midtown Chiropractic v. Illinois Farmers Ins. Co.*, 847 N.E.2d 942, 944-45 (Ind. 2006); *In re Tak Communications, Inc.*, 985 F.2d 916, 918 (7th Cir. 1993), provided the FCC consents to the assignment. 47 U.S.C. § 310(d); *In re Central Arkansas Broadcasting Co.*, 68 F.3d 213, 214-15 (8th Cir. 1993) (per curiam). But this

route was blocked by the settlement, which by operation of the doctrine of res judicata would have precluded any claim by JAS or the other unsecured creditors against the university that arose out of the dispute over the license, since an assignee of a claim (which would have been JAS) is in privity with the assignor (the debtor, represented by the trustee). *Taylor v. Sturgell*, 553 U.S. 880, 894 and n. 8 (2008); *Perry v. Globe Auto Recycling, Inc.*, 227 F.3d 950, 953 (7th Cir. 2000); *Restatement (Second) of Judgments* § 55(1) (1982). So JAS had to proceed as it did—had to try to get the settlement set aside on the ground that the bankruptcy judge had erred in approving it because the trustee had fallen down on the job.

There is no novelty in requiring that a judge determine the reasonableness of a settlement; for example it is required in class actions (Fed. R. Civ. P. 23(e)) because of the potential conflict of interest between the class members and class counsel. See, e.g, *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 744-45 (7th Cir. 2008). Determining the reasonableness of a settlement requires comparing the amount of the settlement to the net expected gain of seeking a litigated judgment. The "expected gain" is the gain if the judgment is favorable, discounted (that is, multiplied) by the probability of a favorable judgment. The qualification "net" signals the need to subtract the cost of pressing ahead to judgment in order to estimate the value of litigating to judgment rather than of settling. Suppose the settlement is $1 million, and a litigated judgment favorable to the plaintiff would be $4 million but the probability of ob-

taining the judgment would have been only 10 percent and the cost of obtaining it (the litigation cost) $100,000. Then the net expected gain from litigating to judgment would have been only $300,000 ($4 million x .10 = $400,000; $400,000 − $100,000 = $300,000)—much lower than the $1 million settlement. And so the settlement would be reasonable.

We are simplifying; we haven't considered intermediate possibilities between a judgment of $4 million (or more) and a judgment of $0, or the possibility of the plaintiff's obtaining an even better settlement by continuing to litigate for a time, or the plaintiff's risk aversion or risk preference, or the difficulty of attaching exact probabilities to inherently uncertain events, or the cost of negotiating a settlement in lieu of litigation. But though simplistic, our example should suffice to indicate the basic analysis required to determine whether an amount accepted in settlement of a claim is reasonable.

Essentially the trustee decided that pursuing a claim for the license (that is, for a determination that PBS was the owner of the license, not the university, and that the debtor was entitled to a big chunk of it by virtue of its quitclaim deed from PBS) was hopeless: the net expected gain was close to zero, given the certificate issued by the FCC, which confirmed the university's continued ownership. If that was a reasonable decision for the trustee to make, his refusal to invest in a further investigation was also reasonable—especially since he would have had to reject the settlement and thus kiss the $100,000 that it had added to the debtor's estate goodbye. And the

settlement had been a steal: the trustee had estimated the promissory estoppel claim to be worth only $35,000 (JAS has not questioned that estimate) and had gotten almost three times that amount. The multiple may have reflected the cost the university would have had to incur to defend against the claim, but the fact remains that $100,000 gave the debtor's estate a windfall.

It's not as if the question of the debtor's rights, if any, under the university's license were straightforward. The university had *wanted* to assign the license to PBS—that much is clear. Indeed it had agreed to do so. That was the basis of the debtor's promissory estoppel claim—that in making the equipment modifications that it would need in order to be able to broadcast on the frequencies that PBS would not be using the debtor had acted in reasonable reliance on the university's promise to assign the license to PBS. The university had even submitted an application to the FCC to assign the license to PBS. That was back in 1994 but the FCC had dawdled in acting on the application. (It has never acted on it, as we'll see.)

Later the university had authorized PBS to file with the FCC an application for a license to modify PBS's broadcasting facilities to enable their use by the debtor, pursuant to PBS's conditional lease of excess capacity to the debtor. PBS had intended to use the occasion of applying to the FCC for the modification license to renew the application for assignment of the broadcast license on the basis of PBS's agreement with the university. But it failed to check a box on the application form that would have indicated that it was applying for the

broadcast license and not just for permission to modify equipment. The FCC interpreted the omission to mean that the application originally submitted by the university to assign the license to PBS was being abandoned, and so it stopped processing the application. (It granted PBS's application for modification—the basis for the debtor's promissory estoppel claim because the modification was made and paid for by the debtor rather than by PBS.) As a result, the assignment of the license was never approved by the FCC and so PBS never had to honor its lease to the debtor of the excess capacity that the license would have given PBS.

The parties' insouciance regarding the assignment of the license may be attributable to its having had little value when the university and PBS made their deal, and indeed until recently. In 1994 the Instructional Television Fixed Service frequency band was little used by its licensees, because they were educational institutions that lacked the resources to exploit broadcasting opportunities effectively. But since 2003 a company named Clearwire has used ITFS (now EBS) excess-capacity leases to create a national wireless broadband network (used by Sprint's smartphones) to provide cellular and Internet service. (For background on Clearwire, see www.clearwire.com/company/our-network, visited Nov. 6, 2011.) As a result, such leases have become much more valuable than they were.

As an alternative to its contention that PBS had acquired the university's lease, JAS argues that the debtor acquired, through PBS's quitclaim deed to it, the latter's

contractual right to compel the university to transfer the license—the deed substituted the debtor for PBS. But the FCC must approve the assignment of a broadcast license, 47 U.S.C. § 310(d), and it could not approve the assignment of an Instructional Television Fixed Service license to an enterprise that, being for-profit, was not legally authorized to receive such a license. An unauthorized assignment would not be in the "public interest," the statutory criterion for the Commission's approving the assignment of a broadcast license. *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 593-94 (1981); *M2Z Networks, Inc. v. FCC*, 558 F.3d 554, 558 (D.C. Cir. 2009).

We can imagine an argument that despite its failing to check the assignment-application box, PBS was the equitable owner of the broadcasting rights conferred by the university's license, and that the university was unjustly enriched by being able to lease to Clearwire (or anyone else) the excess broadcast capacity that "should" have been PBS's to lease to the debtor. The FCC's records of broadcast licenses are a mess and the Commission could, we assume, deem a license to have been transferred with its approval despite the parties' failure to follow required formalities; we haven't been pointed to any statutory or regulatory provision that would forbid such an exercise of administrative discretion. But the Commission might well be unforgiving of PBS's failure to check the right box, and of the generally lackadaisical manner in which the university and PBS had attempted to transfer the license. A denial on the basis of the parties' lack of diligence presumably would be within the Commission's discretion. *Florida Cellular Mobil Communications Corp. v. FCC*, 28 F.3d 191, 200 (D.C. Cir. 1994);

*Royce Int'l Broadcasting Co. v. FCC*, 820 F.2d 1332, 1336-37 (D.C. Cir. 1987).

Anyway we don't understand this to be JAS's theory, and it would be far-fetched. The university tried to assign its license to PBS in 1994, but the assignment had as we know to be approved by the FCC, and it was not approved, and this was not the university's fault. So, stuck with the license, the university was entitled to lease the excess broadcasting capacity that the license had given it—yet the university, not the FCC, would be the defendant under the theory that we've just outlined, just as it is under the theory that JAS is pressing.

That theory (insofar as we understand it, which we may not, because it isn't clearly articulated) is that the FCC *did* approve the assignment, though it has said it didn't, and that if the trustee had rummaged in the FCC's files it would have found the approval. The suggestion is unappealing. If disgruntled broadcasters can peer behind certificates issued by the FCC attesting the existence of a license, an important class of property rights will be unsettled. JAS has never indicated what the legal basis for challenging such certificates might be and we cannot think of any that would be applicable to this suit.

JAS has, it is true, managed to find documents in which the FCC calls PBS the licensee. Maybe the trustee would have found more through discovery. But the certificate issued by the Commission, which states that the university is the license holder listed in the FCC's public license registry, is, as far as we are informed, definitive evidence of the ownership of the license, even if the Commission

may earlier have been confused about who the license holder was. *Crawford v. FCC*, 417 F.3d 1289, 1297 (D.C. Cir. 2005); *Oregon v. FCC*, 102 F.3d 583, 586 (D.C. Cir. 1996). And to repeat a previous point, were PBS the licensee, still the FCC could not approve the transfer of its license to an entity forbidden by law to hold the license: the debtor, a for-profit enterprise.

And remember that the license wasn't actually worth $4.1 million—that the trustee estimated its value to the debtor to be only $600,000 and that this was a reasonable estimate. He thought the probability that a claim to those rights would succeed was zero, but even if it were much higher it still wouldn't have been worth pursuing. Litigation is expensive! If the probability of the trustee's prevailing on such a claim were 50 percent (much too high, in light of our analysis), the expected gain from pressing the claim would be $300,000, but that would be gross rather than net. The $100,000 received in settlement would be gone, leaving an expected gain from litigating of $200,000. It is unlikely that a complex commercial litigation could be conducted for less than that amount of money and therefore the net gain (the gross expected gain minus litigation expense) would be unlikely to exceed $100,000 and might well be negative.

The bankruptcy judge and the district judge got it right: the trustee had acted reasonably in settling the debtor's claim against the university for $100,000.

AFFIRMED.